**Shiah M. ARSHAM,**
**Plaintiff-Appellant,**

v.

**Walter BANCI et al.,**
**Defendants-Appellees.**

No. 74–1673.

United States Court of Appeals,
Sixth Circuit.

Feb. 24, 1975.

**1110**

Samuel T. Gaines, Gaines & Stern, Charles Auerbach, Cleveland, Ohio, for plaintiff-appellant.

Avery S. Cohen, Charles M. Rosenberg, Gottfried, Ginsberg, Gurren & Merritt, Cleveland, Ohio, David A. Botwinik, Pavia & Harcourt, New York City, for defendants-appellees.

Before LIVELY, Circuit Judge and McALLISTER and O'SULLIVAN, Senior Circuit Judges.

LIVELY, Circuit Judge.

In this diversity action the plaintiff Arsham sought damages from the defendants (hereafter collectively referred to as Banci) for breach of an alleged oral contract. Banci manufactures textile fabrics in Italy for sale to the clothing industry in the United States and elsewhere. In 1967 Banci's primary outlet for fabrics used in women's sportswear was Russ Togs, and Banci was actively seeking another major customer for such fabrics. Lawrence Pleet, an employee of Banci at the time, suggested Arsham as one who could "open the door" to Bobbie Brooks, Inc., a major manufacturer of women's sportswear. Arsham was an experienced operator in the field of clothing fabrics who had a close personal and business relationship with Maurice Saltzman, the president of Bobbie Brooks.

Both Arsham and Saltzman were residents of Cleveland, Ohio, the headquarters of Bobbie Brooks. Banci maintained a permanent office in New York City. At Banci's direction, Pleet contacted Arsham and a meeting was arranged between Arsham and Banci. The parties met in the New York office of Banci on June 19, 1967 and it was at this meeting that Arsham claims an oral contract was made. According to Arsham's testimony, Banci told him that he knew of Arsham's relationship with Bobbie Brooks and that he had a proposition that would benefit both of them. The testimony of Arsham continued:

And he proposed selling his line to Bobbie Brooks. And he wanted to know if I could open the door and get started. That were the words he used, could I get him started in there, and I said yes.

Q. Now, prior to that time had you contacted anybody at Bobbie Brooks in an effort to open the door for Banci? A. No, not at all. Before this meeting? No. .

\* \* \* \* \* \*

A. Now, will you get back to this talk you had with Mr. Banci? You told us that he wanted you to open the door for Banci with Bobbie Brooks. Anything else said at that time? A. Well, I asked him what's in it for me, if I can do this. He said he would

give me 5 percent and I agreed with him that my compensation was to be 5 percent of the first year's sales. And I told him at that time that it would take that long before—before that he asked me how long it would be, I said it could be a day, a week, a month, 6 months, a year, but I will certainly finish it before the year is up, and we settled at May 31st. I remember that very clearly.

Q. Now, you settled what as of May 31st? A. Pardon? That our agreement would be finished May 31st, 1968.

Q. And what did that mean to you? A. It means I had a year in which to open the door and I would get 5 percent of the sales written in that year.

Shortly thereafter Arsham met with Maurice Saltzman in Cleveland, told him about Banci's operations and showed him several samples of fabrics which Banci was manufacturing for Russ Togs. Saltzman was interested and turned the matter over to the vice-president of Bobbie Brooks in charge of merchandising. As the result of this meeting, a showing of Banci's fabrics was arranged. This took place in the New York office of Bobbie Brooks. After looking at several suitcases of Banci samples, the designer for Bobbie Brooks stated that his company was not interested because the fabrics "had too much of a men's look." Although Banci knew that Bobbie Brooks manufactured only women's wear, about 40% of the samples which he displayed at this meeting in August 1967 were designed for use in men's clothing. Arsham, Banci and Pleet were all present at this showing.

After this rejection, Banci stated that he would return to Italy and "put together a line more in keeping with what Bobbie Brooks wanted . . .." According to Arsham he kept in touch with the New York buyer and the merchandising vice-president of Bobbie Brooks and passed along to Banci suggested patterns and colors which Bobbie Brooks wanted Banci to supply. Arsham did not discuss the matter further with Maurice Saltzman or attend any other meetings between Banci and Bobbie Brooks personnel. In December 1967 or January 1968 Banci did display a new line of fabrics to Bobbie Brooks. This line suited the needs of Bobbie Brooks, and substantial orders were placed with Banci for these fabrics.

The testimony of Lawrence Pleet, who was no longer with Banci at the time of the trial, supported that of Arsham. His description of the discussion between Arsham and Banci at the August meeting, and his understanding of their arrangement are contained in the following excerpts from his testimony:

Q. In your presence what did you hear Mr. Banci say to Mr. Arsham, and what did Mr. Arsham say to Mr. Banci? A. Mr. Banci told Mr. Arsham that he wanted to open up the Bobbie Brooks account as quickly as possible. Mr. Arsham agreed to try to do so, felt that he could do so. And Mr. Arsham brought out the fact that although of his friendship—he mentioned the friendship—but he also said due to the business situation in that he was busy, Mr. Saltzman, whom he was going to see, was also busy and he couldn't promise any specific time that he could get to it, get a meeting of the two of them together, but he would do it as fast as humanly possible, make a meeting and find out if Mr. Saltzman would be interested in going further and he would report back.

He said, though, I remember he said he would try to do it as fast as possible, but he didn't pinpoint any particular time. Mr. Banci at that time said, "Go to it, do the best you can as fast as you can." And that is where that left.

Mr. Arsham asked him how did he fit into the overall picture if he were successful in doing this, and Mr. Banci told him that he would . receive a 5 percent commission for doing this, and that was it. It took a little more time than that, but that was the essence of the meeting.

\* \* \* \* \* \*

Q. I am sorry. I forgot a question in terms of the meeting. I am going back now to the meeting when the three of you, Mr. Arsham, Mr. Banci and yourself, and you testified that Mr. Arsham was to act as—would you define for me what it was Mr. Arsham was to do? A. Mr. Arsham merely was to—again in the trade we call it open the door—was to set up the channel for Walter Banci and our organization to have the opportunity to meet with the proper people to display our products. It was a "a door opening situation."

Q. And I understand that what you say by door opening, that his responsibility ended at the moment the door opened? A. I don't know whether that is defined as such. Basically someone that opens the door tries to follow it through until the parties get together, and then he steps aside and leaves the work to the two parties.

Q. He was not really to negotiate the transaction? A. That is correct, sir. He was just to get us together and get us with the proper people and get us the opportunity.

Q. And he wouldn't have to service the account in any way? A. No. That is correct. I stated at that meeting Mr. Arsham stated that he was not in a position to service the account, he had obviously other things that he was working on, and he definitely stated that he was not going to service it at all, that his function was to be as I just mentioned.

Banci was not asked to give his version of the meeting of June 19, 1967. His testimony of contacts with Arsham and with Bobbie Brooks is, in pertinent part, set out below:

Q. Did there come a time when you discussed Bobbie Brooks with Mr. Arsham? A. Yes. Mr. Arsham speak to me about Bobbie Brook.

Q. When was this? A. In 1966. And he say that he can get business for me from Bobbie Brook.

Q. Did you have any further conversations with Mr. Arsham about Bobbie Brooks? A. Yes. Several time I say when you put me in business with Bobbie Brook, when I can get my orders. And he reply wait, can't be the moment. Finally one day he came saying that he got the appointment with Bobbie Brook. And I remember that we go together at Bobbie Brook, 1 Park Avenue, and we meet there Mr. Glen Bruce, that this time was the chief stylist of the entire line of Bobbie Brook. And I also meet Marshall.

*　*　*　*　*　*

Q. Now, prior to that meeting did you have any discussion with Mr. Arsham with regard to the compensation he would receive if he obtained orders from Bobbie Brooks or— A. No, we do not speak about this, because naturally if he got for me sign order from Bobbie Brook, I must to pay commission.

Q. And there was no specific discussion of any percentage as far as you can remember? A. No.

Q. O.K. Now, at that meeting you said you met several people. Did you show a line of goods? A. I showed a 1967 line both for men that came University Mills line made from me, and also the ladies' line, 1967 ladies' line. But Mr. Bruce do not found nothing interesting, and I do not get business.

*　*　*　*　*　*

Q. O.K. Now, did Bobbie Brooks give you any orders arising from the goods which you showed at that meeting? A. No. Absolutely no.

Q. When was your next contact with Bobbie Brooks? A. I remember that at the end of 1967, around December, my mill made a new line that got new revolutionary items, the turbo acrylics. Only America make this time this fabric. And my mill was the second in the entire world, and is very hot items. And every pieces that we can produce we sell immediately.

At this point I say now I got the possibility to get Bobbie Brook account. And I know that in this

company we got this time a big buying change. Mr. Maurice Saltzman the president is no more president, and Mr. Adler take his place. Mr. Bruce is no more the stylist, but Mr. Pezor, Larry Pezor take his place. Mr. Marshall is no more with the company. I call Mr. Adler's secretary, and I say I am Walter Banci from Italy, et cetera, et cetera, and I got the new turbo acrylic for immediate delivery.

The day after the secretary called back and say Mr. Adler wanted to speak with you, to make an appointment. And she ask to bring the line of turbo, I mean the line of turbo and also the other line of fabric, but they are interested say only turbo, and he look at the line and they immediately give me business, sample pieces, and they want the option to get turbo order. And I was in business with Bobbie Brook.

Q. Now, at that meeting that you had with Mr. Adler, was Mr. Arsham present? A. No. Mr. Arsham disappear. I don't saw no more Mr. Arsham from the meeting with Mr. Burstein no more.

Q. Was Mr. Arsham's name mentioned at that meeting? A. No, absolutely no.

Q. Did Mr. Arsham bring you any orders out of that meeting? A. No.

\* \* \* \* \* \*

Banci testified that he had never paid anyone just for introducing him to a possible customer and that he paid commissions to agents and salesmen only after the customers had paid for the goods ordered through such persons. In other words, no commission was due unless the salesman procured a signed order and the purchaser paid for the merchandise. An Internal Revenue agent who was trying to collect past due taxes from Arsham in the fall of 1967 testified by deposition. He stated that Banci told him that Arsham would be paid some money if he was successful in obtaining orders from Bobbie Brooks for Banci fabrics.

On May 3, 1968 Arsham sent a letter to Banci advising that he knew of large sales by Banci to Bobbie Brooks and demanding that he be paid a commission on them. Banci did not respond to the letter, but Arsham testified that he saw Banci in New York a few days later at which time Banci agreed to pay 5% on all orders received from Bobbie Brooks through May, 1968, with one-half the payment deferred until a later time. Arsham stated that he received several checks totaling about $3,500.00 from Bobbie Brooks during 1968. It was shown that Banci reduced the price of some of the goods sold to Bobbie Brooks by four cents per yard. Banci denied that he made any agreement to pay Arsham and said that Bobbie Brooks requested the price reduction in order to make a "gift" to Arsham. The district court found that the price reduction took place prior to the meeting between Arsham and Banci in May, 1968 and that Banci did not renegotiate the terms of a previous agreement at that time.

The district court rendered judgment for the defendants. It found (Finding of Fact No. 23) that "Banci obtained Bobbie Brooks as a . . . customer independently of Arsham's efforts. Arsham did not procure any signed orders from Bobbie Brooks." The court concluded that New York was the place where the purported contract was made and where Banci ultimately accepted orders from Bobbie Brooks. From this it was determined that New York law should be applied in deciding whether a valid contract existed between the parties. Citing New York cases the court held:

> According to plaintiff's evidence, Banci made an offer for a unilateral contract. Arsham did not successfully complete the necessary activity which would have contractually bound the defendants. There being no binding offer and acceptance, a contract did not exist between the parties. (Conclusion of Law No. 4.)

The court further concluded that Arsham was not entitled to recover on a

quantum meruit basis because his efforts did not result in the sale of goods to Bobbie Brooks, or in quasi contract, because "Banci did not derive a benefit from Arsham's efforts."

On appeal we are urged to hold that several of the key findings of fact are clearly erroneous. It is also contended that the conclusions of law which the court adopted relate directly to erroneous findings of fact and do not accurately state the rules of law which control this case. In addition to disputing these arguments. Banci argues that whatever arrangement was made between the parties was invalid under the New York statute of frauds. The statute of frauds was pled as a defense in Banci's answer, but the district court did not rule on it. We will consider this issue first.

 The district court was required to apply the conflict of laws rule of Ohio in this case. Klaxon Co. v. Stentor Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); MacPherson v. MacPherson, 496 F.2d 258, 261 (6th Cir. 1974). Ohio follows the traditional rule of *lex loci.* Under this rule, the law of the place of making governs the validity of a contract. Heaton v. Eldridge & Higgins, 56 Ohio St. 87, 97–98, 46 N.E. 638 (1897); Sheerin v. Steele, 240 F.2d 797 (6th Cir.), cert. denied, 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957). Even though Ohio treats its own statute of frauds as procedural, Heaton v. Eldridge & Higgins, *supra,* 56 Ohio St. at 100–102, 46 N.E. 638, if the statute of the state where a contract is made declares it to be "void" if not in writing, the courts of Ohio will not enforce the agreement. The Detroit & Cleveland Navigation Co. v. Hade, 106 Ohio St. 464, 140 N.E. 180 (1922). As stated in 9 Ohio Jurisprudence 833, Conflict of Laws § 116, "The theory of such a case is that a contract void where made is void everywhere."

Whatever agreement existed between Arsham and Banci was clearly made in New York. The statute of frauds of that state (Section 5–701, New York General Obligation Law, McKinney's Consol. Laws, c. 24–A) provides in part:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: . . .

(1) By its terms is not to be performed within one year from the making thereof . . .. (23A McKinney's Consolidated Laws of New York.)

. . . . .

10. Is a contract to pay compensation for services rendered in . . . negotiating the purchase, sale, exchange . . . of a business opportunity, business, its good will, inventory . . or an interest therein . . . 'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . (23A McKinney's Consolidated Laws of New York.)

Since this statute makes non-complying contracts "void," if the transaction between Arsham and Banci was included within its provisions, Arsham's claim must fail even if his version of the agreement is accepted.

██ The testimony does not support Banci's contention that the "agreement" was one which "[b]y its terms is not to be performed within one year from the making thereof." The fact that payment for Arsham's services might take place more than one year after June 19, 1967 is not controlling. The only evidence of the duration of performance is that Arsham was to be paid a commission on all orders received by Banci through May 31, 1968, a time less than one year from the date of the alleged agreement. This transaction does not fall within Subsection 1 of Section 5–701.

 Though the literal language of Subsection 10 of the New York statute appears to cover the transaction between Arsham and Banci, a number of deci-

sions from New York courts have limited its application to situations where all or a substantial part of the assets of a business are involved, or control of a business will pass to the purchaser. Pass v. B.S.F. Co., 40 A.D.2d 813, 338 N.Y.S.2d 295 (1972); Clivner v. Ackerman, 51 Misc.2d 856, 274 N.Y.S.2d 112 (1966); Lounsbury v. Bethlehem Steel Corp., 53 Misc.2d 151, 277 N.Y.S.2d 700 (1967). Though the highest court of New York has not ruled on this question,[1] the United States District Court for the Southern District of New York, in Atlas Steamship Chartering Corp. v. Dillingham Corp., D.C., 314 F.Supp. 1118, adopted the construction placed upon the statute by the lower courts of the State. We find this construction persuasive and hold that the transaction between the parties herein was not within Subsection 10 of Section 5–701.

■■ Arsham asserts that there was no evidence to support that portion of a finding of fact in which the district court set forth Banci's understanding of the discussion which took place on June 19, 1967. While it is true that Banci did not testify directly on this point, the court could properly infer from other positive testimony that Banci did not understand that he had made an agreement to pay a commission unless Arsham produced signed orders. The finding is not clearly erroneous. The other crucial finding which Arsham maintains is clearly erroneous is No. 23, heretofore quoted. It is undenied that Arsham obtained no signed orders from Bobbie Brooks. However, Arsham claims this is immaterial, and that the relationship of seller-purchaser which ultimately came into being between Banci and Bobbie Brooks resulted from his "opening the door." There is certainly evidence to support this position, and if the district court had made such a finding, this court would not be permitted to set it aside. Rule 52(a), Fed.R.Civ.P. However, the evidence also shows that the only meeting

between Banci and Bobbie Brooks personnel ended in a rejection of the Banci line. It further discloses that Arsham did not again contact Maurice Saltzman on behalf of Banci after the failure of the first showing. On the other hand, Banci redesigned his line, introduced a new fibre, and arranged a showing with different personnel of Bobbie Brooks who had replaced those who had agreed to and attended the first showing. None of the Bobbie Brooks people who were involved in exploring the possibility of purchasing fabrics from Banci as a result of Arsham's conversation with Maurice Saltzman were involved in the second showing or the subsequent purchase, so far as the record discloses. Finding of Fact No. 23 is not clearly erroneous.

■ The district court correctly held that, rather than a bilateral agreement being entered into, Banci made an offer in return for an act. The only mode of acceptance by which a contract would have come into existence was for Arsham to perform the act upon which the offer was conditioned. In referring to the first meeting with Arsham, Banci testified, "[a]nd he say that he can get business for me from Bobbie Brook." Arsham's efforts did not produce "business" from Bobbie Brooks and thus there was no acceptance, and no contract. Huntington Pennysaver, Inc. v. Tire Supply Corp., 59 Misc.2d 268, 298 N.Y. S.2d 824 (D.C.Suffolk Co. 1969); Restatement of Contracts, § 59.

■ Having found that there was no contract between Arsham and Banci and that Banci obtained Bobbie Brooks as a customer independently of Arsham's efforts, the district court correctly concluded that Arsham was not entitled to recover in quantum meruit or under a theory of quasi contract. An unsuccessful broker may not recover in quantum meruit when the principal subsequently sells to the same person whom the broker has contacted. Lounsbury v. Bethle-

---

1. The Court of Appeals did discuss the legislative history and purpose of subsection 10, but did not construe the particular language here involved, in Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969).

hem Steel Corp., *supra*, 277 N.Y.S.2d at 706, quoting Levy v. Hayman, 8 A.D.2d 854, 190 N.Y.S.2d 152 (1959). Of course, the finding of no benefit to Banci precludes recovery in quasi contract, the purpose of which is to prevent unjust enrichment. Bradkin v. Leverton, 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970), Restatement of Contracts, § 348.

We find no merit in the arguments of Arsham that Banci was guilty of bad faith or fraud.

Affirmed.