**GENERAL ELECTRIC COMPANY,**
**et al., Plaintiffs,**

v.

**LATIN AMERICAN IMPORTS,**
**S.A., d/b/a LATAM, et al.,**
**Defendants.**

**No. CIV.A.99–92.**

United States District Court,
W.D. Kentucky,
Louisville Division.

July 16, 2002.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter is before the court upon GE's motion (Record No. 139) for summary judgment on LATAM's counterclaims. The court, having reviewed the record and being otherwise sufficiently advised, will grant the motion in part with regard to some of LATAM's fraud counterclaims (Counts 1, 2, 4, and 5) and deny the motion in part with regard to Count 3 (GE–DAKO). Further, the motion will be granted with regard to Counts 8–10 (alleged continuous renewal promise and MABE contract claim), denied with regard to Count 11 (promissory estoppel as to MABE), and granted with regard to Counts 12 (unjust enrichment) and 13 (Florida Franchise and Distributorship Act).

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The plain language of Rule 56 "mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Betkerur, M.D. v. Aultman Hospital Assoc.*, 78 F.3d 1079, 1087 (6th Cir.1996).

### FACTS

In 1992, LATAM was appointed GE's appliance distributor in Peru by virtue of a written agreement which, by its terms, was non-exclusive and would terminate after two years unless renewed. The agreement was personally guaranteed on August 7, 1992, by Guillermo Gonzalez Neumann ("Gonzalez"), a citizen of Peru and a party to this lawsuit, who owns and controls both LATAM and PERU-SPHERE, S.A. ("Perusphere"), LATAM's affiliate. This agreement was renewed twice; the "1994 Agreement" spanned from May of 1994 to March 31, 1996, and the "1996 Agreement" was effective from April 1, 1996 until December 31, 1998. The 1996 Agreement was not renewed after its expiration. GE contends that its relationship with LATAM unraveled due to LATAM's failure to meet sales goals and to pay for the appliances it purchased. The latter contention spawned this litigation, which GE brought to recover $214,693.57 allegedly owed it by LATAM. Additionally, GE seeks a judgment declaring that the expiration of the 1996 Agreement was effective in accordance with its terms and applicable law, that GE is not liable under or in connection with the 1996 Agreement, and that GE had no obligation to sign a new distributorship agreement with LATAM.

LATAM paints a different picture of the facts, and has counterclaimed in several counts. It cites the breadth of its relationship with GE, which, it contends, had it serving as GE's representative or distributor for other divisions of the corporation, including GE Power Systems, GE Lighting, and GE Information Systems ("GEIS"). LATAM also disputes GE's proffered reasons for refusing to renew its distributorship agreement, citing deposition testimony from GE credit representatives indicating that they were not involved in the decision not to renew LATAM's distributorship contract (though acknowledging that LATAM was problematic as to credit issues). LATAM also discusses, in detail, documents which it contends reveal GE's long-standing plan to eliminate independent distributors and replace them with distribution through its affiliate, MABE. These documents include those relating to GE Appliances ("GEA") "Session I" meetings, which were held annually at GE's corporate headquarters in Connecticut. LATAM also cites the deposition testimony of former GEA vice-president Steven Riedel regarding the presentation, at these meetings, of the concept of GE's need to invest in entities and thereby acquire existing distribution mechanisms. (Riedel denied that this was synonymous with a plan or strategy to "do away" with independent distributors, such as LATAM.) LATAM cites other documents which, it argues, confirm that implementation of a plan to eliminate independent distributors began in Central America in 1994, and that GE studied (1) how to keep these independent distributors' profit margins, (2) the likelihood that various independent distributors would sue if terminated, and (3) the costs of terminating the independents.

LATAM also contends that, while GE was beginning to implement this alleged plan to eliminate independent distributors, it was intentionally deceptive in its dealings with them. LATAM cites a speech made by former GEA president Stonesifer in which he referred to the independent distributors as "partners" who held a "sol-

id relationship" with GE, which would be further strengthened. LATAM and Gonzalez also aver that, in August of 1995, Bob Reid (General Manager of GEA Affiliates) wrote to LATAM assuring Gonzalez that MABE would not be authorized to distribute GE products in Peru—an assurance which was repeated by other GE representatives.[1] LATAM contends that, in reliance on these assurances, it renewed its distribution contract with GE on July 25, 1996 (the "1996 Agreement"). However, Gonzalez and LATAM argue, the assurances were false when given, as indicated by various documents LATAM contends reveal GE's intent, all along, to eliminate it as a distributor and replace it with GE's affiliate, MABE, as well as the progressive implementation of this plan. LATAM further alleges that, close in time to the expiration of (and refusal to renew) its distributorship agreement, GE set about terminating its other relationships with LATAM, and took other actions intended to cripple LATAM, which led to its various counterclaims. GE seeks summary judgment on all of these counterclaims.

### COUNTS 1–5: THE FRAUD COUNTERCLAIMS

LATAM's fraud counterclaims are primarily based on two alleged misrepresentations: (1) that GE would continue its relationship with LATAM unless and until LATAM's conduct gave good cause for termination; and (2) that GE would not allow MABE to distribute GE products in Peru. Counts 1 and 2 are styled "Fraud in the Inducement" and claim that GE induced LATAM to enter the contracts embodying their distributorship relationship using the misrepresentation that LATAM would not be terminated (or its contract not renewed) except for cause.[2] Count 3 is styled "Fraud in the Inducement (GE–DAKO)", and alleges that in July, 1997, GE misrepresented to Gonzalez and LATAM that LATAM would be awarded the exclusive long-term distributorship of GE–DAKO[3] in Peru if LATAM agreed to invest monies for infrastructure and purchase a certain amount of merchandise. Count 4 charges fraud in a scheme to disable Gonzalez and LATAM economically (by GE's allegedly failing to disclose that it would not maintain its relationship with LATAM and taking steps to ensure that LATAM would be economically disabled when GE appropriated the market for MABE); Count 5 charges a conspiracy to defraud among GE, GEIS and MABE.

"To prevail on a claim of fraud under Florida law,[4] the plaintiff must establish the following elements: (1) a false representation as to a material fact, (2) the

1. LATAM also cites deposition testimony by Bob Reid, wherein he recounts that Gonzalez expressed concerns regarding rumors that MABE would be coming into Peru to distribute GE products, and Reid told Gonzalez that the rumors were not true and that GE had no intention of replacing Gonzalez with anyone. This exchange took place in 1996, at Lake Tahoe, with other GE representatives (Lopez and Seeley) allegedly present. Reid also testified, in deposition, that Gonzalez often related these rumors to him, and Reid "always" told Gonzalez that the rumors weren't true.

2. Count 1 charges that GE embodied fraudulent intent from the outset of its relationship with LATAM, so that it fraudulently induced LATAM to enter each of its contracts with GE, from the first contract in 1992. Count 2 charges, in the alternative, that if GE did not harbor this fraudulent intent from the beginning, it developed the intent in late 1995 or early 1996.

3. LATAM alleges that GE–DAKO is a GE-controlled Brazilian joint venture that manufactures appliances.

4. The parties generally agree that Florida law governs the fraud counterclaims.

defendant actually knew or should have known that the representation was false, or that the defendant made the representation recklessly without knowledge as to its truth or falsity, (3) the plaintiff reasonably and actually relied upon the representations, (4) the plaintiff incurred foreseeable damages, (5) caused by the defendant's representations." *Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1551, 1564 (S.D.Fla.1990). GE contends that a variety of basic legal tenets warrant summary judgment on LATAM's fraud claims, including: (1) the statute of frauds; (2) a lack of reasonable reliance (because the alleged misrepresentations contradict the subsequent written contract); (3) the economic loss rule; (4) the rule that promises of future performance are not actionable as fraud; and (5) principles of waiver, release and ratification. We find the economic loss rule to be dispositive as to all of the fraud claims except Count 3.

■ The economic loss rule provides that absent a tort independent of breach of contract, the remedy for a party's economic loss lies in contract law. In *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.,* 694 So.2d 74 (Fla.Dist.Ct.App.1997), hotel franchisees sued their franchisor, seeking rescission of the licensing agreements based upon allegedly fraudulent misrepresentations. The complaint alleged that the plaintiffs were fraudulently induced to enter the licensing agreements by virtue of three unfulfilled promises: (1) that they would benefit from becoming part of the Radisson Hotels family and would participate in a "worldwide reservation system listed with more than 4,500 travel agents"; (2) that their hotels would be the sole beneficiaries of the reservation system in the Florida Keys; and (3) that over 40% of their room reservations would come from this system and travel agents. *Hotels,* 694

So.2d at 76. The court considered "the scope of the economic loss doctrine as it relates to allegations of fraud," and held:

It makes sense that a truly independent cause of action for fraudulent misrepresentation, where the ability of one party to negotiate fair terms is undermined by the other's fraudulent behavior, is not barred by the economic loss rule. However, where the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of "fraudulent inducement" to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine....

. . . . .

Misrepresentations relating to the breaching party's performance of a contract do not give rise to an independent cause of action in tort, because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement. Therefore, we clarify that where the alleged fraudulent misrepresentation is inseparable from the essence of the parties' agreement, the economic loss rule applies and the parties are limited to pursuing their rights in contract.

*Id.* at 77–78. The court found the plaintiffs' fraud claims were not independent of the contract and were therefore barred by the economic loss rule. In so holding, the court in *Hotels* noted an earlier holding that "a claim for fraudulent inducement is an independent tort and thus not barred by the economic loss rule," *id.* at 76 (citing *HTP, Ltd. v. Lineas Aereas Costarricenses S.A.,* 661 So.2d 1221 (Fla.Dist.Ct.App. 1995), which had subsequently been upheld by the Florida Supreme Court in *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238 (Fla.1996)). Nevertheless, the *Hotels* court "[a]ppl[ied] common sense to the supreme court's analysis" and re-

jected the argument that "one can always avoid operation of the economic loss doctrine by merely pleading fraud in the inducement." *Hotels*, 694 So.2d at 77. The court looked beyond the label of "fraudulent inducement" and construed the true nature of the fraud claims alleged.

■ GE contends that LATAM's fraud claims, which allege that GE promised to maintain an exclusive, permanent business relationship with LATAM, go to the heart of the parties' agreement embodied in the 1996 Distributorship Agreement, are inseparable from this contract, and are barred by the economic loss rule. Further, GE argues that this contention is bolstered by the fact that the 1996 Agreement contained a disclaimer clause.[5] *See Bates v. Rosique*, 777 So.2d 980 (Fla.Dist. Ct.App.2001). In response, LATAM takes GE to task for failing to discuss *HTP*, *supra*, as only the state's highest court decisions are controlling when a federal court decides an issue under state law. *See Talley v. State Farm Fire & Casualty Co.*, 223 F.3d 323, 326 (6th Cir.2000). Further, this court "may disregard an intermediate state court decision if it is convinced that the highest state court would decide otherwise." *Grego v. Meijer, Inc.*, 187 F.Supp.2d 689, 691 (W.D.Ky.2001).

The difficulty with LATAM's argument is that it has not convinced this court that the Florida Supreme Court would decide otherwise with regard to LATAM's fraud claims. In *Hotels*, the plaintiff had pled fraudulent inducement, but the court held that this mere labeling was not enough to preclude, automatically, operation of the economic loss doctrine—the court was obligated to look beyond the label and construe the claim. *HTP, supra*, is not to the

contrary. In that case, the Florida Supreme Court resolved a split among the lower Florida courts by stating its disagreement with the reasoning in *Woodson v. Martin*, 663 So.2d 1327 (Fla.Dist.Ct. App.1995), which had held that "'the nature of the damages suffered determines whether the economic loss rule bars recovery based on tort theories. If the damages sought are economic losses only, the party seeking recovery for those damages must proceed on contract theories of liability.'" *HTP*, 685 So.2d at 1240 (quoting *Woodson*, 663 So.2d at 1329). *HTP* clarified that fraudulent inducement is an independent tort, with elements distinct from breach of contract, and thus was not a cause of action eliminated by the economic loss rule. *See HTP*, 685 So.2d at 1239. In so ruling, however, the court also cited favorably the reasoning in *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich.App. 365, 532 N.W.2d 541 (1995), which noted:

> The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction ... between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.

*HTP*, 685 So.2d at 1240 (quoting *Huron Tool*, 532 N.W.2d at 545).

■ Thus, we must decide whether LATAM's fraud claims are extraneous to the contract or interwoven with the alleged breach of the contract. The economic loss doctrine "does not bar a cause of action for fraud in the inducement, where the fraud

---

**5.** This clause provides: "Any representation, understanding, proposal, agreement, warranty, course of dealing or trade usage not contained or referenced herein shall not be bind-

ing on the Company. No modification, amendment, rescission, waiver or other change shall be binding on Company unless assented to in writing by Company."

alleged pertains to a term of the contract and is relied upon in inducing the completion of the agreement." *Bankers Mutual Capital Corp. v. United States Fidelity and Guaranty Co.*, 784 So.2d 485, 489 (Fla. Dist.Ct.App.2001). The *Bankers Mutual* court held that claims for fraud in the inducement alleged in that case were independent from the breach of contract actions, because (1) the amended complaint alleged that the qualifying agent for the general contractor had misrepresented the percentage of work completed on the projects for which Bankers Mutual had purchased pay requisitions, and (2) each count of fraudulent inducement alleged that the qualifying agent and the general contractor had failed to list certain creditors, all of which fraudulently induced the plaintiff to enter joint check agreements. *See id.* at 489. The court reasoned:

> To determine whether the economic loss rule bars recovery under fraud, the question is simply this: *is the fraud alleged in an act of performance or in a term of the bargain?* Where, as here, the representation is simply made and relied upon in inducing the completion of the transaction, then clearly it is a term of the bargain. Nothing further was required of the [sellers] in connection with this contract term after they made the representation that all [the company]'s taxes had been paid. If, however, the misrepresentation had been in con-

nection with the seller's performance— such as the ability to provide increased reservations and better hotel management services in Hotels of Key Largo, which required continuing action on the part of the seller, then the fraud is in the performance and the economic loss rule bars recovery sounding in tort.

*Bankers Mutual,* 784 So.2d at 489 (quoting *Allen v. Stephan Co.*, 784 So.2d 456, 458 (Fla.Dist.Ct.App.2000)). Although LATAM apparently contends that the misrepresentations it alleges were merely terms of the bargain, they required continuing action on the part of GE—to keep LATAM as a distributor except for cause and to prevent MABE from ever distributing GE products in Peru. The fraud alleged is an act of performance, is inseparable from the contractual claims, and is therefore barred by the economic loss rule.[6]

GE will thus be granted summary judgment on Counts 1, 2, 4, and 5 of LATAM's Second Amended Counterclaim. Count 3, however, which relies on an alleged misrepresentation concerning GE–DAKO, must be discussed separately. The alleged misrepresentation on which this claim depends purportedly occurred in July, 1997, when "GE misrepresented to Gonzalez and LATAM that it would be awarded the exclusive long-term distributorship of GE–DAKO in Peru if LATAM agreed to invest monies for infrastructure and to purchase

---

**6.** LATAM also asserts another recent decision of the Florida Supreme Court, *Moransais v. Heathman*, 744 So.2d 973, 981 (Fla. 1999), which reaffirmed that court's "determination to limit the application and reach of the economic loss rule." The court discussed the origins of the economic loss rule, noting that it "was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis." *Id.* at 983. *Moransais* held that the economic loss rule did not bar a negligence action where professional services were rendered (a pre-purchase house inspection) and there was no personal injury or property damage. While the court did affirm limitations on the economic loss rule in such cases as *HTP*, it focused primarily on the professional liability context, and the court does not glean anything from *Moransais* which repudiates *Hotels of Key Largo, supra.* Indeed, although *Moransais* issued more than two years after *Hotels*, it did not address or even mention that case.

a certain amount of merchandise," according to LATAM. Elsewhere in the Second Amended Counterclaim, LATAM contends that GE promised, through Don Fontaine, Salvador Batista, Robert Reid and Gabriel Pentada, that LATAM would be the exclusive distributor in Peru, provided that it opened an assembly plant in Peru and trained personnel (as the GE–DAKO units were shipped unassembled). LATAM further alleges that after its initial large purchases and capital expenditures, it learned that GE had lied, that GE–DAKO flooded the market with product sold to another distributor, and that GE informed LATAM that it would not be the exclusive distributor in July, 1998—leaving LATAM with a large volume of GE–DAKO product and losses which could not be recouped.

■ The only argument GE makes in its motion for summary judgment which explicitly applies to this fraud counterclaim

is that DAKO and GE are separate corporate entities, and although GE has an ownership interest in DAKO, it is not controlling, so GE has no right to speak for DAKO or direct who should distribute its merchandise.[7] GE further contends that LATAM's decision not to name DAKO as a defendant to this lawsuit requires dismissal of this counterclaim. LATAM responds that record evidence abounds of GE's control over DAKO.[8] Neither GE nor LATAM, in the pleadings regarding Count 3, cite any authority. GE does not even mention Count 3 in its reply. Because of this lack of analysis, and bearing in mind the standard on summary judgment, this counterclaim will be allowed to proceed.

## COUNTS 8–11: THE BREACH OF CONTRACT AND PROMISSORY ESTOPPEL COUNTERCLAIMS

LATAM makes a breach of contract and a promissory estoppel claim on each of the

7. As support for these assertions, GE cites the deposition of Reynaldo Batista, noting that it has not yet been transcribed. In a recent pleading to this court, however, LATAM asserted that Batista was never even deposed.

8. This evidence includes the following: (1) deposition testimony indicating that in 1996–1998, GE owned 73% of the stock of GE–DAKO; (2) a document purporting to show that, despite GE's transfer of 27.5% of this stock to MABE on September 1, 1998, GE maintained its 73% control by prohibiting MABE from voting its stock and taking any active role in GE–DAKO; and (3) a letter dated April 15, 1997 from Steve Riedel (former GEA vice-president) to David Cote, which purportedly shows GE "taking positions and undertaking obligations on behalf of, and directly affecting, GE–DAKO." With regard to the second piece of evidence, the document LATAM has now provided the court states that GEA "[c]urrently... [c]ontrols 73% of GE Dako's voting shares (45.5% directly and 27.5% indirectly from Mabe)," "[a]ppoints senior management," and "[a]ppoints 8 of 10 Board of Director members." Although the document is undated, it expresses the "[g]oal" to "deconsolidate GE Dako by end of 2000," and lists several "paths" to achieve this as

follows: "Mabe buys Maracaju shares...Mabe controls; Maracaju agrees to revise shareholders' agreement ...GEA no longer controls; Mabe exercises its legal right to vote its shares ...GEA no longer controls." The method whereby LATAM discerned that this document shows GE maintaining a 73% control by prohibiting MABE from voting its stock and taking an active role in GE–DAKO is unrevealed to the court. The third piece of evidence, the letter from Riedel to Cote, is neither cited nor attached as an exhibit, although LATAM quotes from it in its response to the motion for summary judgment as follows: "As both GEA and GE–Dako distributor commitments in [Central America] lapse or can be terminated, GE and Dako brands would enter the Mabe subsidiaries...." And, under the heading "Argentina," "There is currently an opportunity to negotiate with our distributor...to achieve direct distribution of the GE brand in Argentina. We should set up a jointly owned direct distribution company with majority GEA equity, but allow Mabe to run the operation. The Dako brand could then be moved from the distributor at a later date."

two promises it alleges GE made: (1) that its relationship with GE was terminable only upon "good cause," and (2) that it would not use MABE to distribute GE products in Peru.[9] GE contends that summary judgment is warranted on LATAM's contract claims because the 1996 Distributor Agreement contained an integration clause [10] evidencing the parties' intent to make this written agreement their entire agreement, the alleged promises contradict the plain language of this written agreement, and Florida's parol evidence rule bars admission of extrinsic evidence which varies or contradicts the unambiguous language of a contract. GE argues for summary judgment on the promissory estoppel claims by citing Florida cases which provide that the doctrine of promissory estoppel cannot be used to avoid the statute of frauds, which, GE asserts, bars LATAM's alleged "umbrella" contract embodying the promises of a continually renewed relationship with GE and exclusivity (by not using MABE). LATAM's response to these arguments is the bare statement that "[a]s discussed above, GE [sic] promise not to use Mabe in Peru is in writing and incorporated into the contract, therefore it is not barred but [sic] the parol evidence rule."

Given the paucity of LATAM's response, we must, at this stage, review the nature of the proof offered by LATAM in support of GE's alleged promises. As to the alleged promise not to terminate LATAM or refuse to renew its relationship except for cause, LATAM offers the following evidence:

(1) The text of the 1994 speech by former GEA president Stonesifer, which referred to independent distributors as "partners" with a "solid relationship" with GE, *see supra* page 4.

(2) Written "GE/EXIN Guidelines for South American Expansion," dated May 14, 1996, which refers to "other pre-existing commitments" in Peru.[11]

**9.** Count 8 of the Second Amended Counterclaim is styled "Breach of Contract—Terminable Only Upon 'Good Cause'" Count 9 is "Promissory Estoppel—Terminable Only Upon 'Good Cause'"; Count 10 is "Breach of Contract—Will Not Use MABE"; and Count 11 is "Promissory Estoppel—Will Not Use MABE."

**10.** This clause, found in § V(M)(1), provides:

This Agreement contains the entire and only agreement between the parties respecting the sale to and the purchase, distribution and servicing by the Distributor of any Product(s). Any representations, terms or conditions relating to or in connection with the same and not incorporated herein shall not be binding upon either party. In the event of any discrepancy between the text of this Agreement and any Schedule(s) attached hereto, the terms of such Schedule(s) shall control and the rights and obligations of the parties shall be governed thereby. This Agreement wholly cancels, terminates, and supersedes any agreement heretofore entered into between the parties except as expressly otherwise provided below.

.    .    .    .    .

[And, at subsection (3):] No change, modification, extension, renewal, ratification, rescission, termination, notice of termination, discharge, abandonment, or waiver of this Agreement or any of the provisions hereof nor any representation, promise, or condition relating to this Agreement shall be binding upon the Company unless made in writing and signed by one of the aforementioned executives.

**11.** To provide some context, this reference appeared under the heading "Extension of Non–Competition Agreement," and stated that the parties (presumably, GE and EXIN) were "to extend their current non-competition agreement... to those countries where the parties are co-shareholders...if entities engaged in the manufacture and/or distribution of products, but specifically not to Venezuela and Peru where other pre-existing commitments exist." The document further provides that "[i]n countries where there are

LATAM contends that when these guidelines were signed, there was no written distribution contract in effect between GE and LATAM; the 1994 Agreement had expired on March 31, 1996, and the 1996 Agreement would not be signed until July 25, 1996 (though, on that date, it was made effective as of April 1, 1996). LATAM also argues that Bob Reid's deposition testimony confirms that the reference to a "pre-existing commitment[ ]" in Peru reflects an oral promise to renew LATAM's distributorship.[12]

(3) The text of a speech by Bob Seeley at a 1996 distributors' conference at Lake Tahoe, in which he confirmed the circumstances under which GE would refuse to renew a distributor. LATAM contends that this text was given to it, and is therefore a writing which satisfies the statute of frauds.

LATAM further contends that Seeley testified, in deposition, that LATAM met the criteria outlined in the speech.[13]

As to the alleged promise not to use MABE to distribute GE products in Peru, LATAM offers the following evidence:

(1) A letter from Bob Reid to LATAM, dated August 21, 1995, assuring Gonzalez that MABE would not be authorized to distribute GE products in Peru, *see supra* page 4.[14]

(2) Deposition testimony by Bob Reid recounting his reassurance of Gonzalez in the presence of other GE representatives, *see supra* note 1.[15]

### 1. Contract Claims: Counts 8 and 10

■ Having reviewed the proof advanced by LATAM, this court concludes that the alleged promise not to terminate LATAM or fail to renew its distributorship

no shared ownership or prior commitments, there are no restrictions upon Exin or GE for distribution of goods."

**12.** The court's review of this deposition testimony does not convince it that this writing provides evidence of an alleged promise on the part of GE to renew LATAM's distributorship, in perpetuity, except for cause. Reid testified that he believed they had a written contract in place with LATAM at that time (in 1996); he stated "I believe LATAM's agreement was in place when this was written in the middle of the year, and it was renewed at the end of the year." (Reid deposition at 296). Further, when corrected about the gap between the expiration of the 1994 Agreement and the signing of the 1996 Agreement, he stated that "there were provisions that if an agreement lapsed and had not been signed for some reason... we could continue to operate on an ad hoc basis until a signed agreement...." (Reid deposition at 298).

**13.** No citation or exhibit number has been provided for this text. Also, while LATAM provides pinpoint citations to Seeley's deposition in its most recent version of its response

submitted to the court, the deposition itself has not yet been provided.

**14.** Specifically, the letter states that:

...MABE has decided to distribute in Peru through Durex. MABE is also moving to join... in a joint venture in Ecuador. GE, of course, is a partner in MABE and will therefore be a part owner of the venture in Ecuador. However, the new venture in Ecuador will *not* have the authority to market the GE brand outside of Ecuador. GE Appliances will continue to sell GE brands in Peru through LATAM.

I will attempt to make sure that Durex sales people do not falsely claim that their products are GE units or GE made. I hope this answers your questions, Guillermo. (Emphasis in original).

**15.** LATAM also contends that the last of these assurances was given in response to a memo from Gonzalez to Manny Lopez on July 8, 1996. While LATAM has cited and attached the memo from Gonzalez, it has provided no evidence of the alleged assurance, nor even the content thereof.

except for cause, if such a promise existed, was oral in nature, not written. The writings which LATAM has produced do not set forth such a promise. *See First Guaranty Corp. v. Palmer Bank and Trust Co. of Fort Myers*, 405 So.2d 186, 188 (Fla. Dist.Ct.App.1981) ("to comply with the statute [of frauds], the writing must contain the essential terms of the transaction").[16] Moreover, this promise contradicts the express, unambiguous terms of the written agreement, which clearly states that it is to operate for a term of two years. "[U]nder Florida law, the parol evidence rule bars admission of extrinsic evidence which would vary or contradict the unambiguous language of a contract.... This is especially true when the contract contains an integration clause indicating that the parties intended the written agreement to be the entire agreement." *In re Yates Development, Inc.*, 256 F.3d 1285, 1289–90 (11th Cir.2001). Therefore, GE will be awarded summary judgment on Count 8, LATAM's contract counterclaim based on the alleged promise not to terminate LATAM except for cause.

■ As to the second alleged promise, that GE would not use MABE to distribute GE products in Peru, the writing on which LATAM relies is the letter from Bob Reid to Gonzalez, dated August 21, 1995. LATAM's contract counterclaim based on this alleged promise, however, alleges that "[o]n numerous occasions *after April of 1996*, Mr. Gonzalez and LATAM asked GE to agree that it would not use or allow MABE or any other distributor or representative to replace LATAM in the Peruvian appliance market.... GE breached this contract by, among other things,

using and allowing MABE to invade the Peruvian market..." (emphasis added). LATAM cannot use this 1995 writing to show breach of contract, when, by LATAM's allegations, the contract GE is alleged to have breached was created after April of 1996. Thus, with regard to this contract claim, LATAM is relegated to oral assurances, which likewise contradict the written contract (which is unambiguous in that it makes LATAM *an* authorized distributor, not *the* exclusive distributor). Pursuant to the same reasoning as above, GE will be awarded summary judgment on Count 10 of the counterclaims.

### 2. Promissory Estoppel Claims: Counts 9 and 11

■ With regard to the promissory estoppel counterclaims, the doctrine of promissory estoppel cannot be used to avoid the statute of frauds. *See Tanenbaum v. Biscayne Osteopathic Hospital, Inc.*, 190 So.2d 777, 779 (Fla.1966). Therefore, Count 9 of LATAM's counterclaims, based on the alleged promise to renew LATAM's distributorship, fails as a matter of law. With regard to Count 11, however, which is based on the alleged promise not to use MABE in Peru, LATAM has produced a writing which appears to satisfy the statute of frauds—the 1995 letter from Bob Reid to Gonzalez. Moreover, the promise embodied therein appears to meet the observation that "the doctrine of promissory estoppel is only available 'where the promise is definite, of a substantial nature, and [is] established by clear and convincing evidence.'" *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.*, 1999 WL 181412, *11 (S.D.Fla.1999) (quoting *W.R. Grace & Co. v. Geodata*

---

**16.** LATAM argued, in relation to its fraud claims, that Kentucky's statute of frauds, rather than Florida's, applies. The court does not find this argument persuasive. *Arsham v. Banci,* 511 F.2d 1108, 1114 (6th Cir.1975) (despite fact that Ohio treats its own statute of frauds as procedural, court applied statute of frauds of New York, where contract was made).

*Serv., Inc.*, 547 So.2d 919, 920 (Fla.1989)). The reassurance provided in Reid's letter that the new MABE venture in Ecuador would not be allowed to distribute GE products outside Ecuador seems sufficiently definite (contrary to the alleged promise to renew LATAM's distributorship) to allow a promissory estoppel claim regarding the alleged promise not to use MABE in Peru to go forward. Summary judgment is not warranted on Count 11.

### COUNT 12: UNJUST ENRICHMENT

■ GE also seeks summary judgment on LATAM's unjust enrichment counterclaim. Under Florida law, the elements of such a claim are as follows: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *Henry M. Butler, Inc. v. Trizec Properties, Inc.*, 524 So.2d 710, 712 (Fla.Dist.Ct.App.1988). Unjust enrichment is an equitable claim which is precluded where payment has been made for the benefit conferred. *Gene B. Glick Co., Inc. v. Sunshine Ready Concrete Co., Inc.*, 651 So.2d 190 (Fla.Dist. Ct.App.1995). LATAM cannot demonstrate unjust enrichment, in that it entered various business relationships with GE, from which it benefited and for which it was paid.[17] Given the above statements of law, and the fact that LATAM has not even responded to this argument in its pleadings on summary judgment, GE will be granted summary judgment on this counterclaim.

### COUNT 13: VIOLATION OF FLORIDA FRANCHISE AND DISTRIBUTORSHIP ACT

Finally, GE seeks summary judgment on this counterclaim, which alleges that GE violated the Florida Franchise and Distributorship Act ("FFDA"), which makes it unlawful intentionally to misrepresent the prospects or chances for success of a proposed distributorship when selling or establishing such a distributorship. *See* Fla. Stat. § 817.416(2)(a). The misrepresentations LATAM alleges in connection with this counterclaim are discussed above. GE argues first that summary judgment is warranted here because the parties' relationship was premised on the 1996 Agreement, which selected New York law to govern, rather than Florida. *See Davis v. McDonald's Corp.*, 44 F.Supp.2d 1251, 1261 (N.D.Fla.1998) (summary judgment granted for defendant on FFDA claim when parties chose Illinois law to govern their agreement). LATAM's response to this argument is that its alleged "umbrella" agreement with GE (embodying the promises not to terminate LATAM except for cause and not to use MABE) were broader than, and separate and apart from, any single agreement, including the 1996 Agreement, and that this separate agreement contained no provision choosing New York law. Given that this court has dismissed LATAM's contract claims based on the alleged "umbrella" agreement, the only contract which remains in issue is the 1996 Agreement; its selection of New York law precludes this counterclaim, and GE will be awarded summary judgment on Count 13. Accordingly,

---

**17.** GE also asserts that LATAM, in fact, owes GE more than $214,693.57 because LATAM failed to make payment to GE as required by the 1996 Agreement. Indeed, LATAM has admitted in answers to interrogatories that it is indebted to GE, but maintains that GE owes LATAM much more.

**IT IS ORDERED** that GE's motion for summary judgment is **GRANTED** with regard to Counts 1, 2, 4, 5, 8, 9, 10, 12, and 13 of the Second Amended Counterclaim.

**IT IS FURTHER ORDERED** that GE's motion for summary judgment is **DENIED** with regard to Counts 3 and 11 of the Second Amended Counterclaim.