**CUSTOM PRODUCTS, INC. t/a Louisville Drying Machinery, Plaintiff,**

v.

**FLUOR DANIEL CANADA, INC., et al, Defendant.**

**Civil Action No. 3:99CV–401–H.**

United States District Court, W.D. Kentucky.

April 18, 2003.

Bryan J. Dillon, F. Larkin Fore, Fore, Miller & Schwartz, Louisville, KY, for Plaintiffs.

Robert Estes Stopher, Robert D. Bobrow, Boehl, Stopher & Graves, Louisville, KY, Steven G.M. Stein, Carl L. Popovsky, Stephen E. Ray, Jeffrey B. Charkow, Carrie L. Berger, Stein, Ray & Harris, Chicago, IL, for Fluor Daniel Canada, Inc., defendant.

Douglass C.E. Farnsley, David B. Ratterman, Phillip W. Collier, Stites & Harbison, Louisville, KY, R. Bruce Reynolds, Borden & Elliot, Toronto, ON Canada, for Commercial Alcohols, Inc., defendant.

Armer H. Mahan, Jr., Lynch, Cox, Gilman & Mahan, Louisville, KY, Andrew J. Heal, Blaney McMurty, Toronto Canada, for Gentec Equipment Co., defendant.

David C. Schwetschenau, Perry M. Bentley, Stoll, Keenon & Park, Lexington, KY, for St. Paul Guardian Ins. Co., defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

The Court now considers two separate motions, one filed by Custom Products, Inc. ("Custom Products") and GenTec Equipment Company, Inc. ("GenTec"), and the other by Commercial Alcohols, Inc. ("CAI"). Both motions require the Court to determine whether Canadian law or Kentucky law should govern Defendants CAI and Fluor Daniel Canada, Inc.'s ("Fluor Daniel") tort claims. This Court has carefully considered both motions bearing in mind the principle that "choice of law primarily concerns the state's interests in the litigation." *Rutherford v. Goodyear Tire and Rubber Co.*, 943 F.Supp. 789 (W.D.Ky.1996). Ultimately finding that Kentucky lacks a sufficient interest in this case, the Court holds that Canadian law applies to the tort claims.

## I.

In July 1998 Fluor Daniel and CAI, both Canadian residents, entered into an agreement whereby Fluor agreed to provide CAI with engineering, procurement and construction services in connection with the creation of an ethanol plant in Ontario, Canada. To fulfill its obligations in constructing CAI's Ontario plant, Fluor Dan-

iel requested proposals for drying and related equipment needed at the plant.[1] Custom Products, Inc., t/a Louisville Drying Machinery ("LDM"), a Kentucky corporation, responded to Fluor Daniel's request. As a result, discussions allegedly ensued between Fluor Daniel, Custom Products, and representatives of GenTec, a Kentucky corporation affiliated with Custom Products.[2] As a result of those discussions, Fluor Daniel ultimately selected Custom Products to provide the dryers for CAI's Ontario plant and the two parties entered into a written contract ("Purchase Order") on June 11, 1996. Fluor Daniel and Custom Products were the only parties to the Purchase Order. In it Fluor Daniel allowed Custom Products to delegate any part of its obligations to GenTec. Custom Products and GenTec thus ultimately designed and fabricated two dryers. Custom Products and GenTec also supplied the mixing conveyors used to blend the syrup and corn mash which was fed into the dryers, bag houses used to filter exhaust gases from the dryers, scrubbers to clean exhaust from the dryers, two exhaust stacks, and other equipment and materials peripheral to these items.

Custom Products and GenTec have their principal places of business in Kentucky. However, the major component parts of the dryers were not manufactured there. The burner and rotary vales were manufactured in Illinois; the burner manage-

ment system was manufactured in Ohio; the gas valves were manufactured in Indiana and Texas; the dust collectors and scrubbers were manufactured in New York; the conveyors were manufactured in Texas; the gear boxes were manufactured in Indiana; the blowers were manufactured in Wisconsin; and the mixer was manufactured in Pennsylvania. The final assembly of all of these parts was completed at the ethanol plant site in Chatham, Ontario.

After assembling and installing the two Custom Products dryers, CAI started the Ontario plant's operation in November 1997. From then until the evening of December 3, 1997, the drying system operated under GenTec's supervision. On December 4, 1997, an explosion and fire occurred inside the drying equipment which also damaged the bag houses.[3] The explosion did not injure any individuals but significantly harmed the equipment.

GenTec and Custom Products tried to cure the deficiency, but a series of subsequent problems occurred. First, on December 22, 1997, GenTec attempted to start up a modified drying system which caused another fire, resulting in an immediate shutdown of the equipment and the plant. Then, on January 18, 1998, GenTec restarted the modified drying system which, again, caught fire causing CAI to shut down the equipment and the plant. Following these additional fires, Fluor and

1. The plant was primarily an ethanol plant, but one of the bi-products of ethanol is a grain used as animal food. Turning this grain into a separate commodity requires a process to dry the corn mash that results after the ethanol has been separated. Without a drying mechanism, the grains have little or no commercial value because the product quickly degrades. Thus the drying equipment was needed to dry out the grain.

2. Plaintiffs dispute whether GenTec was involved in these discussions. Fluor Daniel

claims that during these conversations, GenTec advised Fluor Daniel that GenTec and LDM had experience in providing dryers similar to those Fluor Daniel needed. Resolution of this disputed point is not particularly important to this Court's determination of the choice of law question presently at issue.

3. Bag houses clean the processed air and reduce the emission of particles discharged into the air.

CAI hired expert dyer consultants to investigate the problem. From February to June 1998, they repaired and modified the Custom Products/GenTec dryers. During much of that time, the plant was shut down. When the plant was operated, it functioned slowly and produced some ethanol with wet grains, which were either sold. in the local market or dried at a high cost by a third-party drying company. The modifications were completed by the end of June 1998. Another dryer, manufactured by a third party, was brought on board in October 1998 to supplement what the Defendants allege was the sub-par performance of the Custom Products/GenTec dryers.

On April 29, 1999, the Custom Products/GenTec dryers experienced another fire and explosion. Once again, although the equipment was damaged, no personnel were injured. Fluor and CAI concluded the Custom Products/GenTec dryers needed to be replaced entirely and the new system became operational in September 2000. The Custom Products/GenTec system was taken out of service.

## II.

The procedural context of this action is slightly deceptive in a way which ultimately affects the choice of law issue. Custom Products preemptively initiated this action in Jefferson Circuit Court seeking a declaration regarding the scope of its responsibilities to Fluor Daniel. Fluor Daniel and CAI removed to federal court on diversity grounds. Both Defendants, Fluor Daniel and CAI, filed counterclaims against Custom Products and third party complaints against GenTec. Specifically, Fluor Daniel alleged claims against Custom Products for breach of contract, breach of express warranty, products liability, negligence, and negligent misrepresentation. In its third-party complaint, Fluor Daniel claimed negligence, negligent misrepresentation, and products liability against GenTec. Similarly, CAI also filed counterclaims alleging breach of contract, negligent misrepresentation, and negligence. In its third-party complaint against GenTec, CAI alleged breach of contract, promissory estoppel, negligent misrepresentation, and negligence.

On September 9, 2002, both parties filed cross motions addressing whether Kentucky or Canadian law should apply to the tort claims.[4] In its motion, Custom Products argues that Kentucky law must apply. Conversely, CAI argues Canadian law should apply. The choice of law question appears critical because, if Kentucky law governs the tort claims, the economic loss doctrine will probably bar most of Fluor Daniel and CAI's tort claims.[5]

## III.

As a federal court sitting in diversity, the Court must apply the law of the state in which it sits to assess which state's substantive law governs the tort claims.[6]

---

4. As to the contract claims, the Purchase Order provides that the laws of the Province of Alberta, Canada shall apply to and govern the interpretation, performance and enforcement of the Purchase Order. All parties agree that Canadian law applies to the contract claims.

5. Since the explosions, Custom Products and GenTec, were both placed in involuntary receivership by their creditors. Their assets have been disposed. *See Bank One, Kentucky, N.A., v. GenTec Equipment Co. et al.,* Jefferson Circuit Court, Case Mo. 00–CI–07263. Their

insurers, Fidelity and Guarantee Insurance Underwriters and St. Paul Guardian Insurance Company, are funding their defense under a reservation of rights. This Court has previously consolidated the insurers' declaratory judgment action with this case. The insurers are parties to this action and have clearly stated they support Custom Products and GenTec's motion to apply Kentucky law.

6. There are four sets of tort claims in this case. First, there are Fluor Daniel's claims against Custom Products. Fluor Daniel and

*See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Anderson Dev. Co. v. Travelers Indem. Co.,* 49 F.3d 1128, 1131 (6th Cir.1995). Accordingly, Kentucky law governs the choice of law analysis.

In what is now a frequently cited trilogy of cases, the Kentucky Supreme Court provided its most recent statement on Kentucky conflicts law in the torts context. *See Foster v. Leggett,* 484 S.W.2d 827 (Ky. 1972); *Arnett v. Thompson,* 433 S.W.2d 109 (Ky.1968); *Wessling v. Paris,* 417 S.W.2d 259 (Ky.1967). As this Court has previously noted, although "[t]hese cases do not present Kentucky law in an entirely clear focus," *Rutherford,* 943 F.Supp. 789, courts do appear in agreement on two points.[7] First, as a starting presumption, there is "no doubt Kentucky prefers the application of its own laws over those of another forum." *Id.* Second, although this principle should generally dictate the out-

come, there are occasions when a careful examination of the facts reveals that the case's actual connection to Kentucky is simply too remote to justify applying Kentucky law. *Id.* Three federal court cases illustrate this important latter point.

First, in *Rutherford,* this Court was asked whether the fact that a car was manufactured in Kentucky sufficiently justified applying Kentucky tort law when two Indiana residents were involved in a car accident in Indiana. 943 F.Supp. at 790–91. Because the case turned on products liability questions, the Plaintiff claimed the state where the assembly occurred had the greatest interest in the outcome. *Id.* at 792. The Court disagreed because,

> Kentucky has neither expressed nor implied a particular interest in regulating products assembled within its boundaries, except where those products cause injury in Kentucky or where they injure

Custom Products were the buyer and seller, respectively, in the Purchase Order. Second, as the owner of the plant that was damaged, CAI has tort claims against Custom Products. CAI was not a party to the Purchase Order, but is a Defendant in the Custom Products Declaratory Judgment Action. Third, Fluor Daniel has tort claims against GenTec. GenTec is a third-party defendant in the case because it was not a party to Custom Products's Declaratory Judgment Action. Fourth, CAI also has tort claims against GenTec. Although these relationships are not ultimately determinative on the choice of law question, the Court mentions them here because it has considered them carefully throughout its analysis.

7. In reaching this conclusion, this Court returned to its more thorough analysis of this trilogy provided in *Rutherford.* There, the Court explained,

> In making choice of law decisions, Kentucky courts originally applied the *lex loci delicti rule,* which required the application of the substantive law of the state in which the tort was committed. This rule had the advantages of simplicity and predictability.

However, it often ignored the true relationship of the parties and other considerations important to a just result. · Consequently, Kentucky abandoned a pure lex loci rule in favor of an "interest analysis" to determine the state with the "most significant contacts" with the litigation. *Wessling,* 417 S.W.2d at 260–261. Since that occasion Kentucky courts have never applied precisely the same language to its choice of law standard. The next year, in fact, the Kentucky Supreme Court said that if Kentucky has "enough contacts," though not necessarily the most significant contacts, then the courts should apply Kentucky substantive law to the dispute. *Arnett,* 433 S.W.2d at 113. A few years later, it said that "the basic law is the law of the forum, which should not be displaced without valid reasons." *Foster,* 484 S.W.2d at 829. More recently, in an insurance contract case, the Kentucky Supreme Court said that applying the "interest analysis" gives to the forum having the most interest in the problem paramount control of the legal issues. *Breeding v. Massachusetts Indemnity and Life Ins. Co.,* 633 S.W.2d 717 (Ky.1982). *Rutherford,* 943 F.Supp. at 791–92.

its citizens. The Court finds no indication that the legislature had an intention to apply its product liability laws to Kentucky products wherever they are used around the country. *Id.*

After surveying the *Foster–Arnett–Wessling* line of cases, the Court determined that, on balance, "Kentucky's true interests in this case is a minimal one." *Id.* Based on the "significant contacts with and interests of Indiana," the Court concluded that even though a connection to Kentucky existed, Indiana law should apply. *Id.* at 793.

Two years later, this time in *McGinnis v. Taitano,* 3 F.Supp.2d 767 (W.D.Ky. 1998), Judge Charles Simpson declined to apply Kentucky law despite the fact jurisdiction was proper and the defendant was a Kentucky resident. The issue in *McGinnis* was whether German or Kentucky law should apply in determining whether evidence of collateral source payments was admissible to prove injuries resulting from a car accident. The accident occurred in Germany. Plaintiff was a California resident. Defendant was a Kentucky resident. The Court began by noting that "under Kentucky law governing conflict of laws problems in tort actions, any significant contact with Kentucky is sufficient to allow Kentucky law to be applied." *Id.* (citing *Bonnlander v. Leader Nat'l Ins. Co.,* 949 S.W.2d 618, 620 (Ky.App.1996) (citing *Foster,* 484 S.W.2d 827, *Arnett,* 433 S.W.2d 109, *Wessling,* 417 S.W.2d 259)). Because neither party was a Kentucky resident at the time of the accident and the accident occurred overseas, the Court held that Kentucky lacked a sufficient connection to warrant applying Kentucky tort law. *Id.* The Court concluded, "The law of the situs of the accident is appropriate under some

circumstances. We find that this is such an instance." *Id.*

Finally, in a 1999 unpublished opinion, the Sixth Circuit reached an outcome consistent with *Rutherford* and *McGinnis,* holding again that, although some connections to Kentucky existed, the contacts were "not enough to justify the application of Kentucky law." *GRW Indus. v. General Motors Corp.,* 1999 WL 435161, **6–7, 1999 U.S.App. LEXIS 14005, *20 (6th Cir. 1999).[8] *GRW* involved an allegation of interference with prospective business advantage. The plaintiff, GRW Industries, was a Canadian corporation which supplied the Delaware-based defendant, General Motors Corporations, with brake and gas line for automobiles. *Id.* at 1999 WL 435161, *1, 1999 U.S.App. LEXIS 14005, *2. Business relations between the parties deteriorated and General Motors claimed it notified GRW that it wanted to terminate the relationship along with a request for more tubes. GRW interpreted this request as an effort to salvage the relationship and sued General Motors when it negotiated with a competitor. In evaluating what tort law to apply, the Sixth Circuit noted three facts weighed in favor of applying Kentucky law: GRW's President Grant Wilson resided in Kentucky; Wilson received the final purchase order (which gave rise to the cause of action) in Kentucky; and GRW's manufacturing site was in Kentucky, albeit not the site where the tubes at issue were manufactured. *Id.* at 1999 WL 435161, *6, 1999 U.S.App. LEXIS 14005, *19. Conversely, the buyer received all shipments in Ohio and each shipment included a letter stating that the order should be construed according to Ohio law. Additionally, the tubes were made and shipped from Canada. Based on these facts the Sixth Circuit concluded

---

**8.** Although this case is neither binding nor authoritative, because there is a relative dearth of caselaw on this subject and because it provides evidence of how the Sixth Circuit responded to similar facts, the Court feels it merits some discussion here.

"Kentucky only has tenuous contacts with the case," while "Ohio, the business site, and Canada, the manufacturing site, are significantly connected this case." *Id.* The court applied Ohio law. *Id.* at 1999 WL 435161, **6–7, 1999 U.S.App. LEXIS 14005, *20.

*Rutherford* and *GRW* thus demonstrate that simply proving *any* contact with Kentucky is not enough to justify applying Kentucky tort law. Rather, the contact must be "significant." *Bonnlander,* 949 S.W.2d at 620; *see also Foster,* 484 S.W.2d at 829 (noting that "if there are significant contacts—not necessarily the most significant contacts—with Kentucky, the Kentucky law should be applied"). Against this backdrop, Custom Products and GenTec argue Kentucky law applies to CAI and Fluor Daniel's tort claims because: (1) both Custom Products and GenTec are Kentucky corporations, each with their principal place of business in Kentucky, and (2) the Defendants' negligent misrepresentation claims are premised on statements Custom Products and GenTec made from their Kentucky offices. Admittedly, these facts present a harder question than in *Rutherford,* where the only contact was the Kentucky-based assembly of the car, and *McGinnis,* where the Plaintiff did not become a Kentucky resident until after the accident. One might argue that faxes and phone conversations alone amount to significant contact. Nevertheless, after carefully scrutinizing the facts and procedural posture in this case, the Court finds several good reasons to follow prior opinions requiring something more than coincidental contacts.

Most persuasively, the quantum of evidence shows that the contacts with Canada

unequivocally amount to a significant interest. Both injured parties, CAI and Fluor Daniel, are Canadian residents. The dryer component parts were shipped from locations across the United States to the Canadian plant. The product that caused the injury was assembled in Canada. The four explosions and fires all occurred at the Canadian ethanol plant. The damages were felt in Canada. Custom Products and Fluor Daniel, the two parties that did form a contractual relationship, agreed that as to contract claims, the laws of Alberta, Canada, would control. The situs of the accident, *McGinnis v. Taitano,* 3 F.Supp.2d at 769, the business site where parts were shipped and assembled, *GRW,* 1999 WL 435161, **6–7, 1999 U.S.App. LEXIS 14005, *20, and the fact that the injured parties were Canadian residents, *Rutherford,* 943 F.Supp. at 792, therefore all favor applying Canadian law. Conversely, *the only identifiable contacts* with Kentucky are the negotiations between the Kentucky and Canadian offices and the fact that some dryer parts were shipped from Kentucky.[9]

To determine whether these two contacts are enough to justify applying Kentucky law, the Court considers whether these facts prove Kentucky has an interest in this case. Importantly, Kentucky's tort and products liability laws are intended to protect Kentucky residents and provide compensation when they are *the injured party. Rutherford,* 943 F.Supp. at 792; *see also Giuliani v. Guiler,* 951 S.W.2d 318, 320 (Ky.1997) (noting that it "is the purpose of all tort law to compensate one for the harm caused by another and to deter future wrongdoing"). Kentucky has ex-

---

**9.** It is true Kentucky courts do not apply a balancing test, but the Court also thinks it makes no sense to look at the Kentucky contacts in a complete vacuum. Although GenTec and Custom Products contend the Court should rule the other way, in doing so they too counsel the Court to take a pragmatic approach and consider all of the facts at hand.

pressed no interest in regulating products assembled here, unless those products either injure a Kentucky resident or cause injury in Kentucky. *Id.* at 792. More pointedly, there is no evidence that Kentucky's laws are intended to shield a party when they ship parts of a product to another jurisdiction, cause injury in that jurisdiction, and then seek to avoid paying damages.

Kentucky's actual interest in its products liability law therefore hardly mitigates in favor of applying Kentucky law. If anything, Kentucky's greater interest is in deterring the type of lawsuit which might seek a choice of law advantage. To be clear, Custom Products clearly beat Fluor Daniel to the courthouse door by filing its Declaratory Judgement action in Kentucky, before Fluor Daniel—the true Plaintiff—filed suit. For all practical purposes, Custom Products is the Defendant in this case. It has no claims against Fluor Daniel and CAI. The same can be said for GenTec whose interests are clearly aligned with those of Custom Products. As the Supreme Court has noted, a plaintiff's "desire for forum law is rarely, if ever, controlling," for if "a plaintiff could choose the substantive rules to be applied to an action ... the invitation to forum shopping would be irresistible." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 820,

105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (citing *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). This Court is reluctant to justify applying Kentucky tort law based upon the mere fact that Custom Products is a Kentucky Plaintiff, where it is conducting out-of-state business that resulted in an out-of-state products liability tort. The purpose and public policy underlying Kentucky tort law provides no logical justification for such a result.

Nevertheless, Custom Products and GenTec contend that, regardless, Kentucky law must apply because applying Canadian law violates Kentucky public policy. If Kentucky law applies, the economic loss doctrine will likely bar some of Fluor Daniel and CAI's tort claims.[10] Conversely, if Canadian law applies, the tort claims will probably proceed. Because applying Canadian law will displace the economic loss rule, Custom Products and GenTec contend this Court must apply Kentucky law instead. *See Kennedy v. Ziesmann,* 522 F.Supp. 730, 731–32 (E.D.Ky.1981) (noting that the "application of a foreign statute, which is contrary to Kentucky public policy, to a Kentucky resident is a factor in choosing whether or not to apply Kentucky law").[11]

The Court finds this argument contrary to Kentucky conflicts analysis. To agree

---

**10.** The economic loss rule provides that absent a tort independent of breach of contract, the remedy for a party's economic loss lies in contract law. *General Electric Co. v. Latin American Imports,* 214 F.Supp.2d 758, 762 (W.D.Ky.2002). The Court is persuaded that some of Defendants' claims—such as the claim for negligence—are probably barred by this rule and that a conflict therefore exists sufficient to justify this analysis. However, because the parties at this time have not addressed the scope of the economic loss rule as to each claim, the Court is not prepared to say all of Defendants' tort-based counterclaims would be barred by the economic loss doctrine.

**11.** Custom Products and GenTec rely substantially on *Kennedy,* 522 F.Supp. 730, and *Bennett v. Macy,* 324 F.Supp. 409 (W.D.Ky.1971) for their public policy argument. Importantly, in both of those cases, injured *Kentucky residents* were seeking the protection of Kentucky law. These cases are consistent with this Court's holding because in this case, the injured party is a Canadian resident. The Court is not persuaded, as Custom Products and GenTec suggest, that a Defendant that may be forced to pay a damages award is an "injured party" under Kentucky law.

with Custom Products and GenTec's logic would reduce all of Kentucky conflicts law to the rule that anytime the holdings of Kentucky federal courts and courts elsewhere conflict, Kentucky law must apply. This would amount to a complete end run around Kentucky conflicts law. That law not only requires the Court to check for a conflict, but also requires it to analyze whether Kentucky has "significant contacts," *Foster*, 484 S.W.2d at 829; *Rutherford*, 943 F.Supp. at 792, sufficient to justify applying Kentucky law. The Court finds no support for such an approach.

Moreover, in our particular circumstance, the argument lacks force for another reason: it is not at all clear that Kentucky necessarily has a strong public policy interest in this case. *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 399 (6th Cir.2000) (holding that even though Kentucky had adopted a particular law, the "fact that a different result might be achieved if the law of the chosen forum is applied does not suffice to show that the foreign law is repugnant to a fundamental policy of the forum state"). Here, neither the Kentucky Constitution, nor the Kentucky legislature has addressed the economic loss doctrine. Nor has Kentucky's highest court taken a clear position on this doctrine. *Compare Falcon Coal Co. v. Clark Equip. Co.*, 802 S.W.2d 947, 948–49 (Ky.App.1990) (applying the economic loss doctrine) *with Real Estate Marketing, Inc. v. Franz*, 885 S.W.2d 921 (Ky.1994) (holding that "we do not go so far as the Court of Appeals' opinion in *Falcon Coal* ...", limiting recovery under products liability theory to damage or destruction of property 'other' than the product itself"). Cer-

tainly, several federal court opinions, including those by this Court, project that Kentucky's Supreme Court would apply the economic loss doctrine, *see, e.g., Mt. Lebanon Personal Care Home Inc. v. Hoover Universal Inc.*, 276 F.3d 845, 849 (6th Cir.2002); *Gooch v. E.I. Du Pont de Nemours & Co.*, 40 F.Supp.2d 863, 876 (W.D.Ky.1999), and this opinion does not depart from that projection. Nevertheless, the Court finds no evidence in these decisions of a strong state public policy on this issue.

A clear legislative or constitutional statement would represent a much clearer statement of Kentucky's exact interest. *See, e.g., Kentucky v. Wilkinson*, 828 S.W.2d 610, 614 (Ky.1992)(noting that "the establishment of public policy is not within the authority of the courts"). At the very least, one would want to rely upon a strong statement by the state's highest court. *See Lewis v. West American Ins. Co.*, 927 S.W.2d 829, 835 (Ky.1996) (explaining that "public policy must be looked for in the Constitution and statutes and the decisions of the courts of last resort of a state ..."). Here, the Court simply does not find a strong enough public policy interest and will not base its entire holding on this federal court's best guess about a particular state law issue.

In sum, the Court finds very little reason to apply Kentucky law in these circumstances. The law of this forum cannot merely always follow the products of Kentucky corporations wherever they may cause damage in other jurisdictions. Canada has an overwhelming interest in this case based on its significant connections to the facts. Canadian law will apply.[12]

---

**12.** The Court is persuaded by Custom Products and GenTec's assertion that both Alberta and Ontario may have an interest in this case. As neither party has provided any specifics regarding Canadian law and as neither party argued whether there is a significant differ-

ence in the laws of the two provinces, the Court is not prepared to say which province's law should apply. A Conference will be needed to reach a conclusion on this remaining choice of law question.

**776**

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The parties have filed cross-motions on the choice of law question. The Court has reviewed the evidence and has filed a Memorandum Opinion. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Canadian law will apply to Fluor Daniel and CAI's tort claims; Custom Products and GenTec's motion to apply Kentucky law is DENIED.

IT IS FURTHER ORDERED that the Court will set a conference to determine which Canadian law will apply.