RENDERED:  DECEMBER 11, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0816-MR

UNITED PROPANE GAS, INC., AND STC, INC.                APPELLANTS


APPEAL FROM MCCRACKEN CIRCUIT COURT
v.        HONORABLE TIMOTHY KALTENBACH, JUDGE
ACTION NO. 15-CI-00643


NGL ENERGY PARTNERS, LP                APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, JONES, AND KRAMER, JUDGES.

JONES, JUDGE:  Appellants United Propane Gas, Inc. ("UPG") and STC, Inc.

("STC") appeal the judgment of the McCracken Circuit Court granting summary

judgment to NGL Energy Partners, LP ("NGL Energy") on a claim for tortious

interference.  Following review of the record and applicable law, we AFFIRM for

the reasons more fully explained below.

# I.   BACKGROUND AND PROCEDURAL HISTORY

NGL Supply Terminal Company, LLC ("NGL Supply"), a wholly-owned subsidiary of Appellant NGL Energy, is a wholesale marketer of natural gas and crude oil. NGL Supply markets its natural gas liquids to wholesalers and retailers using its fleet of leased railcars and its owned and leased terminals located throughout the United States. Customers of NGL Supply may obtain propane, among other products, at NGL Supply's many terminals.

Appellants UPG and STC (collectively referred to as "UPG") are Kentucky corporations in the business of selling propane and propane products. UPG is a retailer selling propane to residential customers across the eastern United States, while STC is a shipping and trucking company affiliated with UPG. On February 20, 2015, UPG entered into a Terminal Access Agreement with NGL Supply granting UPG access to NGL Supply's terminals nationwide to obtain certain propane products from UPG's supplier, CHS, Inc.

NGL Supply routinely requires customers seeking to obtain propane at NGL Supply's terminals to sign terminal access agreements. NGL's terminal access agreement specifies that it is to be interpreted consistently with Oklahoma law, requires customers to comply with local terminal rules and follow federal safety regulations, and otherwise sets terms and conditions relating to the future sale of oil and gas products. It does not entitle the customer to purchase any

product and does not provide any continued right of access to the terminals. Instead, it merely sets forth the terms upon which a customer may access NGL Supply's terminals to make a purchase. NGL Supply's Terminal Access Agreement with UPG further provided:

> **4. Revocation, Term and Termination**
>
> **(a) Revocation.** User [UPG] agrees that NGL's grant of permission hereunder to User to enter Terminals is nonexclusive and nonassignable and may be revoked by NGL at any time, in its sole discretion, without prior notice. Upon revocation, User shall immediately cease using all Devices issued hereunder and shall promptly return all such Devices to NGL.

Record ("R.") at 199.

That same day, NGL Supply verified that UPG met all conditions imposed to access the terminal, and UPG obtained written confirmation from NGL Supply that it could access the NGL Supply terminals in West Memphis, Arkansas, and Dexter, Missouri. UPG then picked up three loads of propane from NGL Supply's Dexter terminal without incident.

Upon learning of the agreement between NGL Supply and UPG, NGL Energy immediately instructed its subsidiary to revoke UPG's access. Four days later, on February 24, 2015, NGL Supply terminated the agreement and revoked UPG's access without explanation. NGL Supply prohibited Appellants from having any further access to the terminals.

UPG claims NGL Supply and NGL Energy have since offered conflicting rationales as to why UPG's access was revoked. R. at 231. According to a February 24, 2015, email, NGL Supply initially informed UPG that UPG was not "set up" in NGL Supply's system. Melissa Roberts, an NGL Energy employee, testified that UPG was considered "not set up" only after access was revoked following UPG's first pickup. That same day, Roberts emailed the Dexter, Missouri, and West Memphis, Arkansas, NGL Supply terminal managers on behalf of NGL Energy, stating: "Please lockout carrier STC. We didn't realize at the time they were setup [sic] that they operated as United Propane Gas, which we do not do business with . . . ." Melissa Roberts explained in her deposition that NGL Energy does not currently sell propane directly to UPG.

However, Roberts and two other NGL Energy employees, Aaron Reece and Bryan Lehman, later testified during deposition that UPG was denied access to NGL Supply's terminals due to safety concerns following a report that a bumper had fallen off a UPG truck inside the terminal. Reece, a senior vice president of NGL Liquids,[1] testified that he decided to revoke UPG's access because he felt that UPG was an unsafe operator and that he had a duty to keep everyone in the terminal safe.

---

[1] NGL Energy, NGL Supply's parent company, is made up of five subdivisions, one of which is NGL Liquids, LLC. According to corporate documentation, NGL Liquids, LLC, is the sole member of NGL Supply.

On August 14, 2015, UPG filed suit against NGL Supply and NGL Energy in McCracken Circuit Court, claiming: (1) NGL Supply breached its contract with UPG; (2) in the alternative, the contract was enforceable through promissory estoppel; and (3) NGL Energy tortiously interfered with the contract between NGL Supply and UPG. On November 12, 2015, UPG obtained leave of court to file an amended complaint adding STC as a co-plaintiff, which was granted on November 20, 2015.

On June 9, 2016, the McCracken Circuit Court granted summary judgment in favor of NGL Supply and NGL Energy on all counts. The McCracken Circuit Court held that (1) there had been no breach of contract because the contract was expressly terminable at will; (2) any detrimental reliance on UPG's part could not create greater rights than the contract itself created; and (3) NGL Energy did not tortiously interfere with the contract between its subsidiary and UPG because the contract in question had not been breached. UPG and STC appealed to this court in appellate action No. 2016-CA-000994-MR.

On March 16, 2018, this Court affirmed the McCracken Circuit Court's decision on the breach of contract and promissory estoppel claims but remanded for further proof on the tort claim. *United Propane Gas, Inc. v. NGL Supply Terminal Co., LLC*, Nos. 2016-CA-000994-MR and 2016-CA-001621-MR, 2018 WL 1357480, at *4 (Ky. App. Mar. 16, 2018). We specifically held that the

contract in question was indeed terminable at will, and, accordingly, had no implied covenant of good faith and fair dealing. However, we reversed regarding UPG's tortious interference claim against NGL Energy, holding that such a tort may be predicated on causing a third person party "not to continue an existing contract terminable at will[.]" *Id.* (internal citations omitted). In doing so, our Court noted that the circuit court's sole basis for dismissing this claim, and NGL Energy's sole appellate argument for affirmation, was that no breach occurred when NGL Supply terminated the contract. Our Court further noted that while the pleadings and exhibits filed of record indicated that NGL Supply was a subsidiary of NGL Energy, "that issue played no role in the circuit court's judgment and has not been raised on appeal." *Id*. at *6 n.6.

On May 1, 2019, the McCracken Circuit Court granted NGL Energy's renewed motion for summary judgment under both Kentucky and Oklahoma law[2] on the tortious interference claim. The circuit court concluded that UPG had failed to create a genuine issue of material fact regarding whether NGL Energy was privileged to interfere with the contractual relations of its wholly-owned

---

[2] At no point has either the circuit court or this Court determined whether to apply Kentucky or Oklahoma law, as both courts agree that both states' laws are substantially the same regarding tortious interference. *United Propane Gas, Inc.*, 2018 WL 1357480, at *4 n.4 ("The parties seem to disagree over whether Kentucky or Oklahoma law applies to this tort claim, but it makes little difference for our purposes. This provision of the Restatement has been adopted as law in Kentucky and Oklahoma."); May 1, 2019, Opinion Granting Renewed Motion for Summary Judgment at 2 ("As an initial matter, the parties apparently disagree as to whether Kentucky or Oklahoma law govern this claim; however, the result is the same under either state's law.").

subsidiary, NGL Supply, or used wrongful means to do so. The court determined that, given the nature of the contract and the parent-subsidiary relationship between NGL Energy and NGL Supply, NGL Energy was privileged to interfere with the contract of its subsidiary under Oklahoma law. In its analysis under Kentucky law, the circuit court concluded that NGL had a privilege to interfere in the contractual relations of its wholly-owned subsidiary and UPG had failed to create an issue of material fact as to whether NGL Energy had acted detrimentally to UPG's interests or with wrongful means. The circuit court additionally noted that although UPG requested additional time to investigate NGL Energy's corporate structure, it had been over a year since the remand giving UPG "ample time to take discovery."

This appeal followed.

## II.  STANDARD OF REVIEW

"[S]ummary judgment is to be cautiously applied and should not be used as a substitute for trial" unless "there is no legitimate claim under the law and it would be impossible to assert one given the facts." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 483 (Ky. 1991); *Shelton v. Kentucky Easter Seals Soc.*, Inc., 413 S.W.3d 901, 916 (Ky. 2013). A motion for summary judgment should only be granted "when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor" even when the evidence is viewed in the light most favorable to him. *Steelvest*, 807 S.W.2d at

482; *Shelton*, 413 S.W.3d at 905. To survive a properly supported summary judgment motion, the opposing party must have presented at least some affirmative evidence showing that there is a genuine issue of material fact for trial. *Steelvest*, 807 S.W.2d at 482.

> Designed to be narrow and exacting so as to preserve one's right to trial by jury, summary judgment is nevertheless appropriate in cases where the nonmoving party relies on little more than "speculation and supposition" to support his claims. *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006). "The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 199 (Ky. 2001).

*Blackstone Mining Company v. Travelers Insurance Company*, 351 S.W.3d 193, 201 (Ky. 2010); *Patton v. Bickford*, 529 S.W.3d 717, 736 (Ky. 2016).

The standard of review on appeal from summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (citing *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); *Palmer v. International Ass'n of Machinists & Aerospace Workers*, 882 S.W.2d 117, 120 (Ky. 1994); CR[3] 56.03). Because there are no factual findings at issue, the appellate court may review that

---

[3] Kentucky Rules of Civil Procedure.

trial court's decision *de novo*. *Shelton*, 413 S.W.3d at 905; *Barnette v. Hosp. of Louisa, Inc.*, 64 S.W.3d 828, 829 (Ky. App. 2002). On appeal, the record must be viewed in a light most favorable to the party who opposed the motion for summary judgment, and all doubts are to be resolved in his favor. *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009).

### III. ANALYSIS

On appeal, UPG asserts the following counts of error: (1) the circuit court erred in failing to conduct a veil-piercing analysis under Kentucky law; (2) the circuit court "failed to address the exception to the parent company's privilege based on its own wrongful conduct"; and (3) the circuit court erred in failing to find an issue of material fact as to whether NGL Energy acted with an improper purpose when interfering with its subsidiary's contract with UPG. Appellants' Br. at 4. UPG contends that NGL Energy was not privileged to interfere in NGL Supply's contract with UPG, and, even if it was, NGL Energy's various reasons for terminating the Terminal Access Agreement are evidence of wrongful means, as UPG believes these reasons are "later-conceived" and therefore "shams to hide NGL Energy's improper conduct." Appellants' Br. at 2.

As a preliminary matter, the parties disagree over whether Kentucky or Oklahoma law applies to this tort claim, and neither our Court nor the circuit court made a determination. For the purpose of this appeal, it makes little

difference, as the result is the same under both Kentucky and Oklahoma state law.

As such, we will apply both, even though it is more likely that Kentucky law

would govern the case before us.[4]

Both the Kentucky and Oklahoma courts have adopted the

Restatement (Second) of Torts § 769 governing intentional interference with

contractual or business relations:

> One who, having a financial interest in the business of a
> third person intentionally causes that person not to enter
> into a prospective contractual relation with another, does
> not interfere improperly with the other's relation if he
>
> (a) does not employ wrongful means and

---

[4] Kentucky applies the "significant contacts" test in tort cases. *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972). "Kentucky has a strong preference for applying its own law, and we have noted previously this 'provincial tendency in Kentucky choice-of-law rules.'" *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 571 (6th Cir. 2016) (quoting *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010) (internal citations omitted). "Importantly, Kentucky's tort and products liability laws are intended to protect Kentucky residents and provide compensation when they are the injured party." *Custom Prod., Inc. v. Fluor Daniel Canada, Inc.*, 262 F. Supp. 2d 767, 773 (W.D. Ky. 2003). Accordingly, Oklahoma law would apply in this case only upon demonstrating "overwhelming interests to the contrary."

Although NGL Supply included a choice of law provision in its contract with UPG, this provision serves to govern contractual disputes rather than tort claims. UPG argues that Oklahoma law ought to control because the alleged injury – the termination of the contract with NGL Supply – was terminated in Tulsa, Oklahoma, where the offices of both NGL Supply and NGL Energy are located. UPG points out that STC's truck was denied access to a particular fuel terminal in Arkansas, that UPG has seventy-three plants spanning ten states, and that NGL Supply had no terminals in Kentucky. This is to no avail. While there are certainly significant contacts with Oklahoma, perhaps even the most significant contacts, Kentucky has a strong interest in governing tort claims brought in Kentucky by Kentucky plaintiffs. *See Foster*, 484 S.W.2d at 829 ("[I]f there are significant contacts–not necessarily the most significant contacts– with Kentucky, the Kentucky law should be applied."). Ultimately, however, choice of law is not outcome-determinative in the case before us.

-10-

(b) acts to protect his interest from being prejudiced by
the relation.

RESTATEMENT (SECOND) OF TORTS § 769 (1979).

Kentucky case law further provides that "a parent corporation has a privilege to interfere in the contractual relations of its wholly-owned subsidiary, unless it employs wrongful means or acts contrary to its subsidiary's interests." *Sparkman v. CONSOL Energy, Inc.*, 571 S.W.3d 569, 572 (Ky. 2019). Our Supreme Court only recently addressed this issue in 2019 in the case *Sparkman v. CONSOL Energy, Inc.* Sparkman, the sole proprietor of a janitorial company, had entered into several contracts with CONSOL of Kentucky, Inc. ("CKI"), the wholly-owned subsidiary of CONSOL Energy, Inc. ("Energy"). *Id.* at 570. A year after Sparkman hired Amy Little as part of his cleaning crew, CKI prematurely cancelled two of those contracts without explanation and hired Little to take over janitorial duties. *Id.* Sparkman brought suit, alleging in part that Energy had interfered with the contractual relationship between CKI and Sparkman by terminating the contracts and giving them to Little, who was having an extramarital affair with one of Energy's employees. *Id.*

In evaluating Sparkman's tortious interference claim, our Supreme Court noted its adherence to the Restatement (Second) of Torts approach to claims of tortious interference. *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988); RESTATEMENT (SECOND) OF

-11-

TORTS § 769 (1979). The *Sparkman* Court was additionally persuaded by Tennessee law to place the burden of proving wrongful means upon the plaintiff. 571 S.W.3d at 572 (citing *Waste Conversion Sys., Inc. v. Greenstone Indus. Inc.*, 33 S.W.3d 779, 780 (Tenn. 2000)). Our Supreme Court further adopted the Tennessee definition of wrongful means and determined that Energy's terminating CKI's contract to Sparkman in favor of Little was not wrongful, even if motivated by the affair. *Id.* The Court explained that wrongful means were limited to "acts which are wrongful in and of themselves, such as misrepresentations of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.*

UPG contends that the circuit court erred in failing to undertake a piercing-the-veil analysis as allegedly required by Kentucky tortious interference law. UPG argues that "the trial court jumped to the conclusion that NGL Supply, as a wholly-owned subsidiary, was identical to NGL Energy without performing any analysis related to whether equity supported veil piercing." Appellants' Br. at 6. This is incorrect for a number of reasons, not least of which is that UPG has raised this argument for the first time before our court. "It is axiomatic that a party may not raise an issue for the first time on appeal." *Sunrise Children's Servs., Inc. v. Kentucky Unemployment Ins. Comm'n*, 515 S.W.3d 186, 192 (Ky. App. 2016).

Even if it had been properly raised before the circuit court, Kentucky law clearly does not require veil-piercing in a tortious interference claim. Our Supreme Court definitively set out the legal analysis for a tortious interference claim in *Sparkman*, which provides parent companies privilege to interfere with their wholly-owned subsidiaries' contracts. However, UPG argues that because our Supreme Court based its *Sparkman* analysis in part upon the Eighth Circuit's *Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781 (8th Cir. 1986) ("*Crowley II*"), we should also find the associated appeal, *Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 702 F.2d 719 (8th Cir. 1983) ("*Crowley I*"), persuasive in requiring a piercing-the-veil analysis.

According to UPG, *Crowley I* demonstrates that a veil-piercing analysis is necessary to afford a parent corporation privilege in interfering with its subsidiary's contractual and business relations. Appellants' Br. at 5. This is not the case. *Crowley I* did not hold that a parent corporation's subsidiary must be its alter ego to establish privilege in a tortious interference claim. *Crowley I*, 702 F.2d at 722. Indeed, the Eighth Circuit applied Missouri law in *Crowley I*, which, like Kentucky, abides by Restatement (Second) of Torts § 769 in claims of tortious interference. *Id*. *Crowley I* held that a parent corporation could not be deemed "in privity" with its subsidiary for the purposes of avoiding paying a successful plaintiff's attorneys' fees in its subsidiary's collateral litigation. *Id*. The court

-13-

observed that "[i]n cases where a creditor seeks to recover from a parent corporation for its subsidiary's debts, . . . full ownership is not enough to find a parent corporation identical to its subsidiary." *Id.* As such, the holding of *Crowley I* is irrelevant to the appeal before us.

Finally, neither the plain text of the Restatement (Second) of Torts § 769 nor any holding or dicta provided by the *Sparkman* Court suggests that a parent corporation may only avoid liability for interference with its subsidiary's contractual relationships if it is identical to its subsidiary. Instead, a parent corporation must only prove that it "wholly owns" its subsidiary,[5] as NGL Energy has done.

---

[5] Our Supreme Court laid out the analysis for piercing the corporate veil in *Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*, explaining:

> A Kentucky trial court may proceed under the traditional alter ego formulation or the instrumentality theory because the tests are essentially interchangeable. Each resolves to two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice. In assessing the first element, the courts should look beyond the five factors enumerated in *White* to the more expansive lists of factors . . . .
>
> . . . .
>
> In any event, where the parent is the wholly-owned subsidiary of the grandparent; the grandparent has provided 100% of the funds for the parent's purchase of the subsidiary; the parent itself has failed to follow corporate formalities; the grandparent pays the subsidiary's employees; the grandparent acts interchangeably with the parent in filing tax returns regarding what is supposedly the subsidiary's business; and the officers of the

-14-

Therefore, it is sufficient that NGL Energy has shown by affidavit that it wholly owns NGL Supply.[6]  Thus, the burden fell on UPG to show that NGL Energy acted detrimentally to NGL Supply's interests or with wrongful means.

We agree with the circuit court that UPG failed to provide evidence that NGL Energy acted detrimentally to NGL Supply's interests.  In its response to NGL Energy's motion for summary judgment, UPG merely asserts:  "it is certainly hard to envision that such termination served the economic interest of its subsidiary."  R. at 232.  Aaron Reece, Bryan Lehman, and Melissa Roberts, all NGL Energy employees, testified that UPG was denied access to NGL Supply's terminals due to safety concerns following a report that a bumper had fallen off a UPG truck inside the terminal.  Reece testified that he revoked UPG's access

---

subsidiary and parent are also officers of the grandparent it is apparent that little, if any, effort has been exerted in maintaining separate corporate identities . . . .

360 S.W.3d 152, 165, 166 (Ky. 2012).  The *Inter-Tel* Court held that the first factor of the alter ego test could be met in part by showing *complete ownership* of the subsidiary by the parent as well as complete unity of interest and control.  *Id.* at 166.  Accordingly, showing that a subsidiary is wholly-owned is only one small facet of the more rigorous alter ego test.  *Compare with Sparkman*, 571 S.W.3d at 572 (emphasis added) ("Based on the weight of authority in other jurisdictions and this Court's adherence to the Restatement (Second) of Torts on this issue, we hold, as a matter of law, that a parent corporation has a privilege to interfere in the contractual relations of its *wholly-owned subsidiary*, unless it employs wrongful means or acts contrary to its subsidiary's interests.").

[6] Although UPG contends that it ought to be given additional time for discovery into NGL Energy's corporate structure, we agree with the circuit court that UPG has had ample time to take discovery.  Over a year passed after our Court's remand of this case back to the circuit court before the circuit court's second summary judgment, and UPG did not attempt to undertake any further discovery during that time.

because he thought they were an unsafe operator and that he had a duty to keep everyone in the terminal safe. "[A] third party who has a financial interest in the business of another may interfere with the contractual relations of that business if he . . . acts to protect his interest from being prejudiced by the relation." *Sparkman*, 571 S.W.3d at 571 (citing RESTATEMENT (SECOND) OF TORTS § 769). Protecting NGL Supply and NGL Energy's employees, reputations, and economic interests from lawsuits due to accidents is in the interest of both companies.

Nevertheless, NGL Energy might still be held liable if there is evidence NGL Energy used wrongful means to interfere with NGL Supply's contract with UPG. "The issue [with wrongful means] is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1979). According to the *Sparkman* Court:

> Wrongful means is "defined to include acts which are wrongful in and of themselves, such as misrepresentations of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law." *Id*. at 784 (citations omitted); *see also* Restatement (Second) of Torts § 769 cmt. d (referring back to wrongful means stated in § 767 cmt. c, which include physical violence, misrepresentation, prosecution of civil suits, criminal suits, violations of recognized ethical codes, and other unlawful conduct).

*Sparkman*, 571 S.W.3d at 572.  According to *Crowley II*, wrongful means may be shown through misrepresentation.  *Crowley II*, 782 F.2d at 783-84.  "Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper."  RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1979).  "A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient."  RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1979); *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 45 (Ky. 2018) (explaining that negligent misrepresentation requires "that the declarant knew the representation was false or made it recklessly").  "The misrepresentations that *usually* represent wrongful means are those directed at the party ultimately breaching its contract with another."  *Crowley II*, 782 F.2d at 783-84 (emphasis added).

UPG argues NGL Energy and NGL Supply's "numerous and conflicting" reasons as to why it terminated UPG's access to its terminal constitute misrepresentations.  Additionally, UPG asserts that NGL Energy and Supply's explanations for termination, including UPG no longer being "set up" in NGL Supply's system and safety concerns, are false.[7]  In support of this argument, UPG

---

[7] UPG claims without citation that these concerns were later proven false.  Appellants' Reply Br. at 5.

posed a series of questions to our Court.[8]  However, as the circuit court summarized, there is no affirmative evidence to support UPG's speculative contentions:

> The only statements from NGL Energy to NGL Supply, the breaching party, are the ones from Melissa Roberts to the Dexter, Missouri and West Memphis, Arkansas terminal managers.  An email sent on February 24, 2015[,] at 2:23 p.m. states:  "Please lockout carrier STC. We didn't realize at the time they were setup [sic] that they operated as United Propane Gas, which we do not do business with . . . ."  Melissa Roberts explained in her deposition that NGL does not currently sell propane directly to UPG.  UPG has provided no evidence that this is a misrepresentation of fact.
>
> Further, UPG alleges that it was falsely told its terminal access was denied because it was not "set up" in NGL's system.  In two emails, NGL Supply's terminal manager[,] Eddie Malone[,] told UPG:  "My home office called to let me know that you are not setup [sic] to load at West Memphis, AR or Dexter, MO.  Do not send anymore [sic] trucks to these locations for loads.  We cannot load them" and "All I know is I was told that you were not setup [sic] and we could not load your trucks at Dexter or West Memphis."  However, Melissa Roberts

---

[8] UPG queried, again without citation:

> If safety were the reason for termination, why would the NGL entities give other opposing and unrelated rationales including the false representations that it was related to technology problems or payment concerns?  How could Bryan Lehman make the decision to terminate the agreement based on safety concerns if he was not aware of any issues with an alleged malfunctioning truck?  If it were truly a policy of NGL to exclude carriers for safety concerns, how had the company failed to turn away any other carrier or implement any other safety-related exclusion in the past?

Appellants' Reply Br. at 5.

testified in her deposition about the conversation with Eddie Malone, clarifying: "[W]henever we made the decision to lock out the carrier we, I notified the terminal [because] we had, you know, told them that they were cleared, so we were then going back and telling them that they were not cleared, so don't load them." These statements were not misrepresentations of fact constituting "wrongful means."

R. at 278-79.

"[A] party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Patton*, 529 S.W.3d at 723 (citation omitted). "In order for circumstantial evidence to be sufficient to prove a civil claim it must do more than suggest a possibility, and a recovery is not authorized if liability is a matter of conjecture, surmise or speculation; if a [fact-finder] is required to speculate, the party must lose upon whom the burden of proof ultimately rests." *Gross v. Barrett*, 350 S.W.2d 457, 459 (Ky. 1961). Accordingly, we agree with the circuit court.

UPG additionally argues that there exists an issue of material fact as to whether NGL Energy acted with "improper purpose" in causing NGL Supply to terminate its Terminal Access Agreement under *Hornung*, 754 S.W.2d 855.[9] In

---

[9] UPG incorrectly maintains that cases interpreting § 769 of the Restatement (Second) of Torts use the terms "wrongful means" and "improper purpose" interchangeably as a "defining limitation of parent company privilege to interfere with subsidiaries' contracts." To support this claim, UPG cites to cases applying Arkansas and Missouri law. *See Crowley II*, 782 F.2d at 783

that case, our Supreme Court concluded that Section 767 of the Restatement "fairly reflect[s] the prevailing law of Kentucky" regarding improper interference with contractual relations. *Id.* at 857. Thirty-one years later, our Supreme Court relied upon *Hornung* in choosing to apply the Restatement (Second) of Torts § 769 to claims of intentional interference by parent corporations in contracts of their wholly-owned subsidiaries. *Sparkman*, 571 S.W.3d at 571. Thus, *Hornung* supplies a general rule for claims that "the opposing party 'improperly interfered' with [a party's] prospective contractual relation[,]" whereas *Sparkman* applies to specific situations in which a parent corporation has already been shown to wholly own its subsidiary. *Hornung*, 754 S.W.2d at 859; *Sparkman*, 571 S.W.3d at 571; *see also* RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979).

Even if the "improper purpose" analysis were deemed to apply, UPG has not presented the Court with a genuine issue of material fact as to whether NGL Energy improperly interfered with NGL Supply's access agreement with UPG. Under *Hornung*, "Section 767 sets forth seven factors to be considered by

---

(holding that a parent company could be liable for interfering with its subsidiary's contracts "to the extent that they did not employ wrongful means or act for an improper purpose when interfering"); *T.P. Leasing Corp. v. Baker Leasing Corp.*, 293 Ark. 166, 171, 732 S.W.2d 480, 483 (1987) ("[A] parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose."). The *Sparkman* majority cited both of these opinions and chose to exclude "improper purpose" from its legal analysis; only the *Sparkman* dissent chose to impose this additional element on parent corporations. *Sparkman*, 571 S.W.3d at 571-72, 574.

the court . . ."; however, "[u]nless there is evidence of improper interference, after due consideration of the factors provided for determining such, the case should not be submitted to the jury." *Hornung*, 754 S.W.2d at 858. In that case, Hornung was denied a college football broadcast announcer position due to past gambling activity, his playboy persona in a beer commercial, and his close association with professional football. *Id*. at 859. Hornung alleged that those reasons were mere subterfuge and he was in fact rejected so that another contender would get the job. *Id*. Our Supreme Court held that, while improper means may "be inferred in an interference action by proof of lack of justification," something more than speculation must be "presented to contradict the reasons given." *Id*.

UPG again argues that "[t]he varied and conflicting reasons offered by NGL Supply and NGL energy [are] certainly evidence sufficient to infer an improper purpose for the underlying decision to cause the contract to be terminated." Appellants' Br. at 11. UPG further alleges that NGL Energy's safety concern was frivolous because UPG's tank was allowed to exit NGL Supply's terminal carrying propane, questioning: "If safety was the real reason for termination, wouldn't NGL Supply and NGL Energy maintain an incident report or other evidence to record such a significant event? Would the same safety standard be applied to other entities accessing the terminal?" *Id*.

-21-

From this argument, it is unclear what, if any, improper purpose the fact-finder is intended to infer. UPG has failed to offer any evidence other than conjecture to suggest that NGL Energy was not justified in its interference in its subsidiary's contract. "'[C]onclusory allegations based on suspicion and conjecture' are not sufficient to create an issue of fact to defeat summary judgment." *Henninger v. Brewster*, 357 S.W.3d 920, 929 (Ky. App. 2012) (quoting *Harstad v. Whiteman*, 338 S.W.3d 804, 812 (Ky. App. 2011)).

Summary judgment is also appropriate under Oklahoma law. To establish a claim of tortious interference under Oklahoma law, a plaintiff must prove: "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co., Ltd.*, 2009 OK 12, ¶ 15, 204 P.3d 69, 74 (Okla. 2009). "Additionally, the claim is viable only if the interferor is not a party to the contract or business relationship." *Id.* "[T]he determination of whether a parent corporation can be liable for tortious interference with the contracts of a subsidiary is a question that must be determined on a case by case basis, analyzing the factors provided in the Restatement [(Second) of Torts § 767.]" *Hawk Enterprises, Inc. v. Cash Am. Int'l, Inc.*, 2012

OK CIV APP 66, ¶ 19, 282 P.3d 786, 794 (Okla. 2012). The Restatement

(Second) of Torts § 767 provides:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

In *Hawk*, the court concluded that the exact relationship between the defendant corporation and its subsidiary was not developed sufficiently to make a determination as to their relationship. *Hawk*, 282 P.3d at 796. In that case, the evidence did not establish whether the subsidiary was wholly or partially-owned, nor did it disclose the extend of the decision-making authority of any shared employees. The *Hawk* court held that the majority of the § 767 analysis was informed by the relationship between the parties. *Id*. at 794.

This view was adopted by the Western District of Oklahoma in *Davis v. PMA Companies, Inc.*, although that court provided the following distinction:

> Focusing on the last of § 767's seven factors, the relationship between the parties, the *Hawk* court reversed summary judgment and remanded the case for additional proceedings. In analyzing whether the parent-defendant was a stranger to the contract between its subsidiary and the plaintiff, the court looked both at the nature of the underlying agreement—a franchise contract between the plaintiff and the subsidiary, for which the parent had signed a guaranty—and the relationship of the parent and subsidiary. Emphasizing that "the exact relationship between [the subsidiary] and the [parent-defendant] [was] not fully developed in this record," meaning it was unclear whether the parent wholly or only partially owned the subsidiary and the extent of the decision-making authority and control of the parent over the subsidiary, the court directed the parties to address those "material" issues on remand. *Id.* ¶¶ 20–22, 292 P.3d at 795.

> Unlike in *Hawk*, the relationship between the parties in this case is clear. Not only does PMA wholly own MMC, the SPA expressly gave PMA control over MMC by granting PMA three of the five positions on MMC's Board of Directors. Moreover, the contracts involved in this matter are different than those at issue in *Hawk*. PMA is not just a guarantor of one party's obligations to another agreement. In contrast, the Employment Agreement between MMC and Davis came about as a result of the SPA between PMA and Davis. Given the nature of the contracts and PMA's control over MMC, PMA is a party to the Employment Agreement. Thus, since the alleged interferor—PMA—is not a stranger or third-party, Davis cannot maintain a cause of action for tortious interference.

-24-

*Davis v. PMA Companies, Inc.*, No. CIV-11-359-C, 2013 WL 866893, at \*5 (W.D. Okla. Mar. 7, 2013).

Similar to the case in *Davis*, the record in this case establishes that NGL Energy was not a third party to the contract between NGL Supply and UPG. Instead, NGL Energy wholly owns and exercises control over NGL Supply. Reece, the Senior Vice President of NGL Liquids, a division of NGL Energy, established that he directed, controlled, and signed the agreement between NGL Supply and UPG. Reece further testified that "because we are [NGL Supply's] sole customer . . . we would be the ones that are kind of in charge of the terminal access agreements . . . . We're involved in the contract between NGL Supply and UPG." In this case, NGL Energy and NGL Supply were acting as and through one, single person – Reece. This evidence is uncontroverted.

Given the nature of the contract and the relationship between NGL Energy and NGL Supply, NGL Energy is not a stranger or third-party to the terminal access agreement and is therefore privileged to interfere with the contract. Under Oklahoma law, UPG cannot maintain a claim of tortious interference.

## IV. CONCLUSION

In light of the foregoing, we affirm the judgment of the McCracken Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

David L. Kelly
Paducah, Kentucky

BRIEF FOR APPELLEE:

C. Thomas Miller
Matthew S. Eddy
Paducah, Kentucky